FEHRER, Respondent, vs. MIDLAND CASUALTY COMPANY, Appellant.

*November 8, 1922—February 6, 1923.*

*Insurance: Suicide as a defense: Presumption: Death by asphyxiation as accidental death: Evidence: Question for jury: Construction of insurance policies: Application for insurance: Incorrect answers: Fraud: Answers inserted by insurer.*

1. There is a strong presumption against suicide; and when suicide is alleged as a defense the burden is on the defendant to establish such fact.
2. In an action on an accident insurance policy, where the evidence as to whether the death of the insured was the result of accident or suicide is wholly circumstantial, every other hypothesis than suicide must be excluded to take the case from the jury.
3. Evidence as to the ill health of the insured and financial difficulties and the physical facts incident to his death are *held* sufficient to make it a jury question as to whether death resulted from accident or suicide.
4. Death by accidental asphyxiation is within the term "violent external and accidental means" in a policy insuring against bodily injury sustained through such means.
5. Conditions in an insurance policy which, being drawn by the company, contains many conditions difficult for a layman to understand, will be liberally construed in favor of the insured, and the insurer, claiming an exception, should point it out specifically so that it meets the test of common understanding.
6. A policy insuring "against bodily injury . . . sustained solely through violent external and accidental means . . . as follows: . . . Blood poisoning, sunstroke, . . . asphyxiation," etc., covers death by accidental asphyxiation.
7. The prorating clause of a standard policy does not apply as between a life policy and an accident policy.
8. An incorrect answer to a question in an application for an accident insurance policy, as to whether applicant was in sound condition mentally and physically, is *held* insufficient to annul the contract in the absence of intentional and false misrepresentation of the facts, the question requiring a conclusion by the applicant.
9. The verdict of the jury, on conflicting evidence, as to whether insured made false statements in his application, cannot be disturbed.

10. An insurance company which issued an accident policy on an application containing no answers to questions as to whether insured had had or was suffering from certain infirmities, and as to what diseases or accidental injuries he had had during the past five years, waived the answers thereto, though it inserted negative answers in a copy of the application attached to the policy, where the attention of the insured was not called thereto and the company's manager was present when it was filled out by the agent and went with him to get insured to sign it.

　　Eschweiler and Jones, JJ., dissent.

APPEAL from a judgment of the circuit court for Milwaukee county: W. B. QUINLAN, Judge. *Affirmed.*

This is an action brought by the widow of Joseph Fehrer, Jr., beneficiary in an accident policy insuring against bodily injury sustained through violent external and accidental means. The defendant claims that the insured made false statements in his application; that his death was not the result of violent external and accidental means, within the meaning of the policy; that the death of the deceased was the result of suicide; and that the policy had lapsed for nonpayment of premium at the time of the death.

The case was submitted to a jury on a special verdict. The jury found that the deceased came to his death solely through violent external and accidental means; that the deceased had not committed suicide; that he did not make any false statements in his application for insurance; that he did not misrepresent any matter in such application which was untrue or contributed to the risk or loss; that the agent of the company knew of the facts, if any, regarding misrepresentations in the application which breached the conditions of the policy; and assessed the damages in the full sum insured in the policy, with interest.

The defendant made the usual motions to set aside the verdict; to change the answers in the verdict; to set aside the judgment, and to grant a new trial. The defendant assigns as error the failure of the court to grant the motions of the defendant.

The application for the policy contained the following question: "10. Are you in sound condition mentally and physically?" The deceased answered this question "Yes."

The application contained this question: "11. Have you ever had or are you now suffering from or subject to fits, disorders of the brain, or any bodily or mental infirmity or deformity (including hernia or rupture)?" This question was not answered.

The application also contained the question: "14. What disease or sickness or accidental injury have you had during the past five years?" This question was not answered.

The deceased agreed that recovery on the policy should be barred in the event that any statements material either to the acceptance of the risk or the hazard assumed by the company were false.

When the application reached the defendant it inserted in the copy of the application attached to the policy issued to the deceased the answer to question No. 11 "No," and to No. 14 "None."

On the day of his death the deceased was found in the bathroom of his home. The doors to the house were locked; the bathroom door was locked; the deceased was found in the bath tub lying full length with his clothes on, with the exception of his shoes, coat, vest, and collar. In the bathroom, at the entrance, were electric lights which could be turned on by a push-button. The lights had not been turned on and the room was dark. There were also two combination gas and electric light fixtures near the bath tub. One of these gas jets had been partly turned on, allowing the escape of gas in the room. The deceased's hat, overcoat, coat, and vest were in the hall. His shoes were in the bathroom, near the bath tub, placed in order. The undertaker found on the left side of the face of deceased what he called a roughing of the skin, underneath which was coagulated blood. There was blood found on deceased's nostrils and on his shirt.

Such were the physical facts surrounding the death of Mr. Fehrer.

*Orlaf Anderson* of Milwaukee, for the appellant.

For the respondent there was a brief by *Glicksman, Gold & Corrigan,* attorneys, and *M. K. Whyte,* of counsel, all of Milwaukee, and oral argument by *Walter L. Gold.*

The following opinions were filed December 5, 1922:

CROWNHART, J.    The defense of suicide is strongly and ably urged by counsel for the defendant. The law is well settled, based on human experience, that there is a strong presumption against suicide. The love of life and the immorality of taking one's own life turn the mind against suicide. So it is that when suicide is alleged in defense the burden is on the defendant to establish such fact. In such a case, where the evidence is wholly circumstantial, as in this case, every other reasonable hypothesis to account for the death must be excluded to take the case from the jury. *Krogh v. Modern Brotherhood of America,* 153 Wis. 397, 141 N. W. 276; *Pagel v. United States C. Co.* 158 Wis. 278, 148 N. W. 878; *Travelers' Ins. Co. v. Allen,* 237 Fed. 78; *Stephenson v. Bankers' L. Asso.* 108 Iowa, 637, 79 N. W. 459; *Home Ben. Asso. v. Sargent,* 142 U. S. 691, 12 Sup. Ct. 332.

The evidence in this case bearing on suicide is voluminous and we can but briefly review it. The defendant contends, as a motive for self-destruction, that deceased was in ill health and financially embarrassed and that the physical facts point indisputably to suicide. It is true that deceased had been suffering from ill health for four or five weeks immediately prior to his death, so as to keep him from his office most of the time, but it is not shown that he was dangerously ill or that he had despaired of recovery. On the contrary, it appears that on the day of his death deceased had gone down town in a street car and had expressed himself as feeling much improved and ready to go back to his

business. He had appeared optimistic and cheerful. He had been ill only a short time. He was a man of cheerful disposition. He had been active in business for many years and very seldom detained from business because of sickness. He had not required the attendance of a physician. It does appear that he had suffered more or less from headaches for many years. There is little if anything in these circumstances to suggest suicide. There is even less in the suggestion of financial embarrassment. There were no present financial difficulties. They were at the worst only a cloud in the offing. It is improbable that the deceased, with a happy home life and a cherished wife, would turn his back on a meager suggestion of financial trouble, which by his experience and capacity might be easily overcome, and leave his widow to face the shadow of disaster alone in her sorrow. We dismiss these two phases of the evidence, which are made much of by the defendant, as unsubstantial.

The physical facts are more suggestive of self-destruction, but are they so conclusive as to furnish no basis for a jury to find to the contrary? We think not. Our common judgment and experience teaches us that accidents often happen which are hard to explain on any basis of reason or logic. That the house was locked is not significant. The wife was away. No one was in the home except the deceased, and in a large city the custom of locking the front door is not unusual. The door had a Yale lock, which would lock upon closing. If the deceased was to take a bath he would naturally lock the front door under the circumstances. The locking of the bathroom door also is not unusual when a person is about to take a bath. This door was locked with a turn bolt. It was his custom to lock the door. It may seem peculiar that deceased should take his bath at this time of day. But it must be remembered that he was not well and a bath would be refreshing after his trip into the city. He had not taken his customary bath the

day before and his wife had spoken to him about it, and he had replied that he would do so that night. The deceased had lived in his then residence only a short time—three months or so. In his former residence the electric lights were turned on at the base of the bulb by turning a button, and there the fixtures for lights were similarly situated with reference to the tub as in his new home. It is assumed that the deceased turned on the gas, either accidentally or intentionally. It was found only partly on. This is a fact hardly consistent with suicidal intent. Having that intent, the deceased would naturally assure his death promptly with a sufficient supply of gas by fully turning on the one gas jet, and, indeed, he would be more likely to turn on both jets, which were close together. The deceased had removed his coat, vest, and collar before entering the bathroom. Why did he do this? It is strongly suggestive of an intent to take a bath. He had removed his shoes in the bathroom and carefully placed them side by side near the tub. This also is suggestive of his intent to take a bath. He did not remove his stockings, pants, or vest. Why not? It is suggested that it occurred to him to turn on the light and the water. During his illness the deceased had fainting spells or spells in which he appeared to be dazed. The plaintiff claims, with some plausibility, that the deceased, owing to the habit acquired in his former residence of turning on the light at the bulb, may have had a fainting or dizzy spell, and in reaching to turn on the light he had accidentally reached the gas and partly turned it on, when he fell into the bath tub. The force of habit is strong within us, and especially is this so with elderly people. Having for many years acquired the habit of turning on the light in the bathroom at the bulb, it is not at all unlikely that he may have attempted to do the same thing at this time, especially if he was seized with a fainting spell, and thus he might have made the mistake of turning the wrong button. The defense claims that he turned on the gas and then deliberately got into the tub

while he was being asphyxiated. The plaintiff, however, contends that this is improbable, and she presents what seems to us the more reasonable theory; that is, that the deceased, in a dazed or fainting condition, reached to turn on the light and by accident turned on the gas, and at this point fainted and fell into the tub. This theory is borne out by the fact that the undertaker found that there was a roughing of the skin of the face, which caused coagulated blood underneath the skin. How did this happen? It is suggested by the defendant that it may have happened by removing the deceased from the tub. This is not persuasive. The deceased was then dead, and blood would not coagulate under the skin from an injury received at that time. There is evidence to the effect that there was blood upon the deceased's shirt and in his nostrils. This is suggestive of accident and that he fell into the tub.

Mr. Fehrer in his lifetime was a man of excellent reputation, had many friends, carried on a large and successful business, had a happy home life, was cheerful in his disposition, had expressed himself immediately prior to his death as to a hopeful future both as to business and as to his health, had in times past expressed himself as opposed to suicide, and all these facts submitted to the jury strongly tended to establish the fact of accident as against the theory of suicide. It made a question for the jury, and the finding of the jury on that question is conclusive. The deceased lived an honorable life and died an honorable death. That is the record as made by the jury on sufficient evidence.

Assuming now, as we must, that deceased came to his death by reason of accidentally turning on the gas when in a dazed or fainting condition, and that he fell into the bath tub and became asphyxiated, the question arises, Was his death the result of "violent external and accidental means" within the meaning of the policy? We have no difficulty in arriving at our conclusion on this point. The law is well established that death by asphyxiation through accident

comes within the term "violent external and accidental means."

In *Paul v. Travelers' Ins. Co.* 112 N. Y. 472, 479, 20 N. E. 347, a leading case on the subject, the court says:

"As to the point raised by the appellant that the death was not caused by external and violent means within the meaning of the policy, we think it a sufficient answer that the gas in the atmosphere, as an external cause, was a violent agency in the sense that it worked upon the intestate so as to cause his death. That a death is the result of accident or is unnatural imports an external and violent agency as the cause."

In the note to 11 Am. Law Rep. 389, the rule was stated as follows:

"Death from inhaling gas is within the ordinary life policy or accident policies insuring against death from external, violent, and accidental means."

Many cases are cited to this proposition. On this point we hold the verdict of the jury to be sustained by the evidence and the law.

However, the policy itself covered death by accidental asphyxiation. Defendant claims that asphyxiation was not the sole cause of death, but that his illness contributed to the accident, assuming the facts as claimed by the plaintiff. The rule is well settled in the law that the conditions in a policy of insurance will be liberally construed in favor of the insured. This rule was made necessary by the fact that the contract is drawn by the company containing many conditions hard for a layman to understand, and making it easy for the company to overreach the insured. The reasons for such rule may be found in *DeLancey v. Rockingham F. M. F. Ins. Co.* 52 N. H. 581; 1 Joyce, Ins. (2d ed.) p. 581, § 221; *Wickham v. United Brotherhood,* 178 Wis. 564, 190 N. W. 436. We have no desire to restrict this rule in the least. Insurance that does not insure may easily become a delusion and a snare to the unwary. It is well for both parties to the contract that it be made plain, simple, and

easy to understand. When the contract is brought into court by the defendant, claiming an exception, he should be able to point out the exception specifically so that it meets the test of common understanding. The policy in question provides coverage as follows:

"Against bodily injury (herein called such injury) sustained solely through violent external and accidental means (suicide, or any attempt thereat, whether sane or insane, not included), as follows: . . .

"Blood poisoning, sunstroke, freezing, hydrophobia, asphyxiation, unprovoked assaults and choking by swallowing, as the result of such injury, shall be deemed to be included in the said term 'such injury.' "

That language is plain enough and needs no involved analysis to determine its meaning. Death by accidental asphyxiation is specially and plainly covered.

Defendant claims that the insurance had lapsed by nonpayment of the premium. The evidence on this point we deem conclusively establishes payment of the premium in the regular course of business, and there was no lapse.

Defendant also claims the right to prorate the loss because the insured carried life insurance with other companies without notice to defendant company. We have recently held that the prorating clause of a standard policy does not apply as between a life insurance policy and an accident insurance policy. *Arneberg v. Continental C. Co.* 178 Wis. 428, 190 N. W. 97.

The defendant also assigns as errors on the trial the rulings of the court on admission of evidence, improper instructions to the jury, and failure to submit certain questions in the special verdict as requested by the defendant. These assignments have had our careful attention, but we fail to find any reversible error therein.

We now come to the contention of the defendant that the plaintiff made false statements in his application pertaining to his health which wholly voided his policy. We have set out in the statement of facts the questions and answers re-

ferred to in this contention. The answer to question 10—
"Are you in sound condition mentally and physically?"—
requires a conclusion of the applicant, and his failure to
draw the proper conclusion, unless he intentionally and
falsely misrepresented the facts, will not be sufficient to
annul the contract. The evidence on the subject is quite
extensive, and it will serve no good purpose to review it in
detail. Suffice to say that the evidence is sufficiently con-
flicting to make it a question for the jury, and the verdict of
the jury cannot be disturbed. It is very significant that
question 10, which is a general question and calls for a con-
clusion, is followed by questions 11 and 14, which are
specific and require a definite statement of facts. Questions
11 and 14 were not answered in the application. Defend-
ant received the application without such answers and issued
the policy thereon, and hence it must be deemed to have
waived the answers to these questions. True, it proceeded
to insert the answers in a copy of the application attached to
the policy, but the company had no authority to make such
insertion, and it appears that the insured's attention was not
called to the copy of the application wherein such answers
were inserted. Moreover, the manager of the defendant
company was present when the application was filled out by
the agent of the company in the agent's office, and went
across the hall into the office of the deceased with the
agent, and the two of them got the deceased to sign it.
Courts cannot countenance the practice of an insurance com-
pany making answers to questions in the application with-
out the applicant's knowledge and then seeking to avoid its
liability because such answers are false. All of these ques-
tions were specifically submitted to the jury on sufficient
competent evidence, and we see no reason to further discuss
the matter.

*By the Court.*—The judgment of the circuit court is
affirmed.

ESCHWEILER, J. (*dissenting*).   Courts and juries are naturally and properly inclined in cases involving such a distressing occurrence as is presented in the record here to resolve that such a death was the result of accident rather than design, and I regret that it is impossible for me to concur in the conclusion by the majority upholding the verdict of the jury on that question in this case.

There is and can be no question but that the gas was turned on in the bathroom by the deceased.   The testimony is to the effect that it required something of an effort to turn on the gas in this particular fixture, and necessarily it required some conscious effort on the part of the deceased. It was conceded from the testimony of the plaintiff herself and is apparent from the situation and the height of the fixture that it could not have been turned on by the mere falling or stumbling of the deceased.

No match was found in the bathroom and evidently he had made no attempt to light the gas.   There was no evidence that he had acquired the habit, either in the then or former residence, of turning on the light in the bathroom, for this, Mrs. Fehrer testified, she usually did herself, and when it was turned on it remained burning all night.   The jet from which the gas was escaping was just above the end of the bath tub where the faucets and vent are placed.   His body was found with the head resting at the other end, entirely within the tub, resting on the left side and with his right hand at his nose.   The small discoloration on the left temple was noticed only by the undertaker at the time of his preparing the body for burial, and it was so slight that it presented no elevation or signs of swelling whatsoever.   The doctor who was called immediately after the finding of the body and worked on the same some time did not testify as to having seen any outside marks of violence or injury, and in his death certificate submitted by plaintiff as part of the proofs of death he stated that he did not discover any visible

contusion or wound on the body of the deceased. At noon of that day deceased refused an invitation to go for a drive with an intimate friend on the ostensible ground that he had business to transact that afternoon at his office. It is quite evident that he did not go to his office as so stated.

From the facts the conclusion seems irresistible that this death was not an accidental one.

I am authorized to state that Mr. Justice JONES concurs in this dissent.

A motion for a rehearing was denied, with $25 costs, on February 6, 1923.