WIGER, Respondent, vs. MUTUAL LIFE INSURANCE COMPANY OF NEW YORK, Appellant.

*April 9—May 12, 1931.*

For the appellant there were briefs by *Knowles & Doolittle* of River Falls and *Miller, Mack & Fairchild* of Milwaukee, and oral argument by *Bert Vandervelde* of Milwaukee and *L. S. Doolittle*.

For the respondent there was a brief by *White & White* of River Falls, and oral argument by *Ferris M. White*.

WICKHEM, J.   The insured died from the effects of carbon monoxide gas generated by an automobile in the garage at the rear of his home.   At the time of his death deceased was fifty-seven years of age.   For twenty-seven years he had been cashier of the Farmers & Merchants State Bank of River Falls.   He was also the general executive head of the bank.   He was highly regarded in the community and had many friends, a fine home, was generally regarded as a man of substance, and took pride in his position in the community.

For some time prior to his death the affairs of the bank had not been in good shape.   Following an examination of the bank on August 13, 1929, the commissioner of banking instructed the directors of the bank to meet him at Madison.   This meeting was held on September 12, 1929, and was attended by five of the directors, including Mr. Wiger, the insured.   The commissioner reviewed the condition of the bank and made several recommendations looking to remedial measures.   One of the recommendations was that Mr. Wiger

be removed as cashier. This recommendation was made in his presence, and the commissioner testified that "he was pretty much floored. He was crestfallen and very much upset." Following this conference the affairs of the bank were reviewed by letter from the commissioner of banking, in which it was pointed out that the liquidity of the bank was only thirteen per cent. as against thirty-five to fifty per cent. normal; that the percentage of real-estate loans was too high; that the amount of paper unsecured by tangible collateral was very much in excess of the normal percentage; that the amount of loans secured by liens on livestock and machinery was greatly in excess of the proper percentage for such loans; that there has been a gradual increase in the percentage of slow paper and a large amount of admitted losses. The overdrafts were excessive in number. The cash reserve was very low. The letter closes with the recommendation that Mr. Wiger be deposed as executive officer, although the commissioner was satisfied to have him remain as president or director. This letter came to Wiger's desk and was read by him. Nine days later his body was found in the garage. Thereafter the commissioner took charge of the bank. It is claimed by appellant that other irregularities were disclosed after his death by the examination of the commissioner. On July 31, 1929, the cash book showed a cash shortage of $1,597.61. On the next day the shortage was only $139.79, the difference having been made up by Wiger giving his personal note to the bank on July 31st. The shortage was an accumulation over some period of time, but it is claimed by the appellant that shortages and overages tend to equalize each other, and that this was an abnormal amount of cash shortage. Two days before his death Wiger made two entries on the books of the bank. One charged loans and discounts $1,000. The other credited his own personal account with $1,000. It was thus made to appear that one Nels Peterson had borrowed $1,000 from the bank

on September 25th, and that Wiger had deposited $1,000 in his own checking account on that day. Actually, neither of these things happened. Prior to this time Wiger had loaned Peterson a larger amount than the directors thought was wise, and Wiger had reduced the amount of the Peterson note by using his own funds. On the day in question he credited his account with the amount so applied and made the corresponding charge to loans and discounts. On the day before his death he made two other entries which are claimed to be false. One charged bills payable with $1,049.49, indicating that the bank had borrowed that amount. The other credited the bond account with the same amount, indicating a sale of bonds in that amount. Neither of these transactions actually occurred. These entries were subsequently made the subject of a claim by the commissioner of banking against Wiger's estate. Two years prior to his death Wiger had transferred to his wife three items of real estate, none of the deeds of which were recorded until after his death. The inventory and appraisal of Wiger's estate showed assets of $11,095.26, and claims of creditors amounting to more than $50,000 have been filed.

It appeared that deceased had additional property in Upper Michigan and also in Washington. Some of this consisted of timber lands on which mortgages were outstanding or title to which was in litigation. There is no evidence in this case as to its value.

The garage in which the insured's body was found is located on an alley back of the residence of the insured. It is twenty-one feet long and eighteen and one-half feet wide, and designed to hold two cars. It is of hollow-tile construction with concrete floors and a ceiling of insulite. On the side towards the house there is one ordinary door which opens in. It does not close automatically. On the alley side are two sets of triple doors. On the morning of Wiger's death two cars were stored in the garage, a Buick

on the south side and a Ford on the north side. Both cars were pointed towards the house and there was a space between them of about three feet. Wiger lay in this space at a slight angle, with his head towards the front of the cars and his right shoulder slightly under the running-board of the Ford. His feet were near the back wheels. There was no trace of a bruise or contusion on the body such as might be expected to result from a fall. The Buick did not belong to Wiger and was frequently out of use for two or three days at a time. When it was not in use it was kept on tire jacks which fitted under the hub caps and raised and lowered by a single up-and-down movement of the attached hand lever. When Wiger's body was found the jacks had been removed from the two rear wheels of the Buick. The motor of the Buick was still running. He had entered the garage about 8:30 in the morning and his body was found between four and five o'clock that afternoon. The day was warm and there was no need to operate the motor for the purpose of warming it up while the jacks were being removed.

There is evidence to the effect that Mr. Wiger knew of the dangers from monoxide gas, and had commented within two months of his death upon the fact that a man ought to know better than to start a car in a garage without opening the doors. From all this the appellant contends that the evidence points to a single conclusion that the deceased committed suicide; that it is plain that his financial affairs and the affairs of the bank were approaching a crisis; that he was to be deposed from the work which gave him a livelihood, humiliated before the community, caused to lose the friendships which he treasured so highly, and subjected to the possibility of further embarrassment upon the discovery of irregularities that had not then come to the knowledge of the commissioner. He knew the effects and properties of monoxide gas. There was no need to run the motor for the purpose of warming up the engine. The absence

of bruises indicated that he had not been suddenly overcome and caused to fall upon the garage floor. There was in the nostrils of Mr. Wiger a coating of an oily substance which resembled soot, indicating that he had come in contact with the oily soot from the exhaust either by being in close proximity to the exhaust or by lying on the ground while the car was running. This conclusion is based on the fact that monoxide gas is lighter than air and tends to rise while the ordinary ingredients of the exhaust are heavier than air and tend to sink.

The respondent's contention is that the evidence tends clearly to show accidental death; that the insured was robust and healthy, happy and contented with his domestic relations; that he was in the bank the day before his death and at the close of the bank suggested to the assistant cashier that they go out and see one Murphy about a past-due note. It started to rain and they called up Mrs. Murphy on the telephone and found out that he was not in. He said he would call some other time. The notes were left in the note pouch at the bank, and Mr. Wiger and the assistant left the bank at the same time that night. After Mr. Wiger's death the Murphy notes were found in his pocket. On the night of September 26th he informed Henry Zorn that he was going out in the country early in the morning, and on the morning of the 27th the deceased was seen on the streets of River Falls going to the bank. On the morning of the 27th he had his breakfast, read the newspaper, and went out to the garage, and was never thereafter seen alive. The testimony of Henry Zorn was that he saw Mr. Wiger on the night of September 26th, and played whist with him; that he appeared about the same as usual and stated that he hoped it would not rain all night because he had to go into the country early in the morning.

The same comments that were made by this court in *Fehrer v. Midland Cas. Co.* 179 Wis. 431, 190 N. W. 910,

are applicable to this case. In the *Fehrer Case* the court, speaking through Mr. Justice CROWNHART, said:

"The defense of suicide is strongly and ably urged by counsel for the defendant. The law is well settled, based on human experience, that there is a strong presumption against suicide. The love of life and the immorality of taking one's own life turn the mind against suicide. So it is that when suicide is alleged in.defense the burden is on the defendant to establish such fact. In such a case, where the evidence is wholly circumstantial, as in this case, every other reasonable hypothesis to account for the death must be excluded to take the case from the jury."

We think the facts in this case are no more indicative of suicide than were the facts in the *Fehrer Case*. Certainly they are sufficiently strong to justify the jury in coming to the conclusion of suicide, but that does not by any means exclude a reasonable inference that the insured met his death by accident. He was apparently in good health. He was on good terms with his family, and had plans for the morning's activities. He had evidently gone to the bank to get a note which he proposed to collect that day. The jury might very easily come to the conclusion that he had started the motor, forgetful of the fact that the car was on jacks; that he had stepped out of the car to remove the jacks, and that he had been overcome during that process. There is evidence that the action of monoxide gas poisoning can be instantaneous. It is entirely possible that the deceased got a concentrated dose of the gas while bending over to operate the jack with the hand lever. We think the question of suicide was clearly a jury question.

The second contention of appellant is that even though the factor of suicide be eliminated, this was not a death by accidental means. The policy requires not only that the death be accidental, but that the means of death be accidental. Since the means of death were set in motion by the voluntary act of the decedent, and since the consequences

were the result of this act, without the intervention of any mischance or slip in the doing of the act, it is contended that the means of death were not accidental. On this subject there is a conflict of authority. To quote from the case of *Caldwell v. Travelers Ins. Co.* 305 Mo. 619, 267 S. W. 907:

"There are two clearly defined lines of cases on this question. One holds that, where an unusual or unexpected result occurs by reason of the doing by insured of an intentional act, where no mischance, slip, or mishap occurs in doing the act itself, the ensuing injury or death is not caused through accidental means; that it must appear that the means used was accidental, and it is not enough that the result may be unusual, unexpected, or unforeseen.

"The other line of cases holds that, where injury or death is the unusual, unexpected, or unforeseen result of an intentional act, such injury or death is by accidental means, even though there is no proof of mishap, mischance, slip, or anything out of the ordinary in the act or event which caused such injury or death."

The only case in Wisconsin that appears to have considered this question is the *Fehrer Case,* heretofore cited. In that case the evidence was such that the court assumed that the deceased actually turned on the gas in his bathroom while he was in a dazed condition, and that he thereafter fell into the bath tub and was asphyxiated. The court says:

"Was his death the result of 'violent external and accidental means' within the meaning of the policy? We have no difficulty in arriving at our conclusion on this point. The law is well established that death by asphyxiation through accident comes within the term 'violent external and accidental means.'"

The court cites to this point *Paul v. Travelers' Ins. Co.* 112 N. Y. 472, 20 N. E. 347.

In *Lewis v. Ocean Acc. & G. Corp.* 224 N. Y. 18, 120 N. E. 56, 7 A. L. R. 1129, the insured came to his death as a result of pricking a pimple on his lip. He died as the result of an infection, evidently caused by the presence of

germs upon the instrument which was used for the purpose. The court, speaking through Mr. Justice CARDOZO, held that death was effected through accidental means. The court says:

"Unexpected consequences have resulted from an act which seemed trivial and innocent in the doing. Of itself, the scratch or the puncture was harmless. Unexpectedly it drove destructive germs beneath the skin, and thereby became lethal. To the scientist who traces the origin of disease there may seem to be no accident in all this. 'Probably it is true to say that in the strictest sense, and dealing with the region of physical nature, there is no such thing as an accident.' HALSBURY, Ld. Ch., in *Brintons v. Turvey*, L. R. [1905] A. C. 230, 233, 2 Ann. Cas. 137. But our point of view in fixing the meaning of this contract must not be that of the scientist. It must be that of the average man. *Brintons v. Turvey, supra; Ismay v. Williamson*, L. R. [1908] A. C. 437, 440, 77 L. J. P. C. N. s. 107, 99 L. T. N. s. 595, 24 Times L. Rep. 881, 52 Sol. Jour. 713. Such a man would say that the dire result, so tragically out of proportion to its trivial cause, was something unforeseen, unexpected, extraordinary, an unlooked-for mishap, and so an accident. This test—the one that is applied in the common speech of men—is also the test to be applied by courts."

In *Lickleider v. Iowa State Traveling Men's Asso.* 184 Iowa, 423, 166 N. W. 363, 168 N. W. 884, 3 A. L. R. 1295, the court said:

"It makes no difference whether the injured man or some other person voluntarily sets in motion the first of a series of events which, in connected line of causation, results in his injury or death. If, to use the language I have quoted, the resulting injury and violence to him 'unexpectedly took place,' or was 'an unexpected result from a known cause,' or was produced 'without design or intention,' or was 'an unusual and unexpected result, attending the performance of a usual or necessary act,' or was an 'event happening without the concurrence of the will of the person by whose agency it was caused,' or if it was 'caused or produced without design,' it falls directly within the letter and spirit of the

definition which has been placed upon the words by the most competent lexicographers, as well as by our most eminent jurists who have given attention thereto."

The court, in the same case, in commenting on the words "accident" and "accidental" states that they "have never acquired any technical meaning in law, and when used in an insurance contract they are to be construed and considered according to the common speech and common usage of people generally."

In *Cantrall v. Great American Cas. Co.* 256 Ill. App. 47, the court states, in commenting on the death of the insured by monoxide gas poisoning:

"It is firmly established that an injury or death caused by the unconscious or involuntary inhalation of poisonous gases is an injury or death caused by accidental means."

In *Brown v. Continental Cas. Co.* 161 La. 229, 108 South. 464, a physician voluntarily inhaled chloroform for headache and insomnia, and lost his life due to an overdose. It was not contended that he committed suicide, but it was contended that he did not lose his life by injuries occurring through accidental means. The court said:

"We do not believe that the doctrine stated, making a distinction between 'accidental death or injury' and 'death or injury by accidental means,' means that, under a policy of insurance against death or injury by accidental means, the insurance company is not liable for an accidental death or injury resulting from a voluntary act in which the insured did not intend or anticipate a fatal or injurious result."

The court goes on to state that the element of the unexpected was present in this case; that the insured inhaled more chloroform than he expected to inhale. The means or cause of his death was not that he intentionally inhaled chloroform, which he had done many times before, but that he unintentionally inhaled too much chloroform.

In *Christ v. Pacific Mut. L. Ins. Co.* 312 Ill. 525, 144 N. E. 161, 35 A. L. R. 731, the court held that death caused by typhoid fever resulting from germs taken by a workman from his employer's water system furnished for drinking purposes, is by external, violent, and accidental means within the meaning of an insurance policy.

In *Townsend v. Commercial Travelers Mut. Acc. Asso.* 231 N. Y. 148, 131 N. E. 871, 17 A. L. R. 1001, the insured died as a result of an infection caused by a hypodermic needle which his daughter had used at his request. It was held that the death was by accidental means.

In *Vennen v. New Dells L. Co.* 161 Wis. 370, 154 N. W. 640, the employee drank polluted water and became ill with typhoid fever. It was held that the fact that the injury might have occurred from carelessness or negligence does not affect the conclusion that it was accidentally sustained. The court says:

"As declared in *Northwestern Iron Co. v. Industrial Comm.* 154 Wis. 97, 142 N. W. 271, 'In giving construction to such statutes words are to be taken and construed in the sense in which they are understood in common language, taking into consideration the text and subject matter relative to which they are employed.' The words should be given, as intended by the lawmakers, their popular meaning. *Sadowski v. Thomas F. Co.* 157 Wis. 443, 146 N. W. 770. 'A very large proportion of those events which are universally called accidents, happen through some carelessness of the party injured, which contributes to produce them. . . . Yet such injuries, having been unexpected and not caused intentionally or by design, are always called accidents, and properly so.'"

It is our conclusion that the term "accidental means" must be interpreted according to the usage of the average man. So interpreted we have no doubt that the means of death in this case must be designated as accidental. To eliminate

from the definition of "accidental means" all cases where the injury happened as the natural or foreseeable result of a force or event voluntarily set in motion by the insured may have some scientific justification, but is contrary to the common understanding of the term and tends unfairly to limit such policies to cases where the insured is guilty of no negligence.

Appellant assigns as error the refusal of the court to give the following instruction requested by the appellant:

"The burden of proof is on the plaintiff to show that the death of C. N. Wiger resulted directly from bodily injury independently and exclusively of all other causes, and that such bodily injury was effected solely through external, violent, and accidental means."

The instruction given by the court was as follows:

"I charge you as a matter of law that monoxide poisoning is within the terms of the contract of insurance which I have just read to you. It is death caused by bodily injury through external, violent, and accidental means, unless the deceased came to his death by the taking of his own life intentionally either when sane or insane."

The instruction requested was properly refused for the reason that there was no issue of fact to which it could relate. It is elementary that burden of proof, in the sense of the risk of non-persuasion or obligation to convince a jury, exists only in connection with an issue of fact. In view of what has heretofore been said with reference to the meaning of the policy, we are satisfied that the defense of suicide presented the only issue of fact in this case and that the instruction given by the trial court was correct.

*By the Court.*—Judgment affirmed.