## NEW YORK LIFE INS. CO. v. MELGARD.

### No. 5208.

Circuit Court of Appeals, Seventh Circuit.

Jan. 5, 1935.

Rehearing Denied Feb. 5, 1935.

Edwin S. Mack, Arthur W. Fairchild, and Bert Vandervelde, all of Milwaukee, Wis. (Miller, Mack & Fairchild, of Milwaukee, Wis., of counsel), for appellant.

Francis L. Brewer, of Richland Center, Wis., and Oscar T. Toebaas, and Harold M. Wilkie, both of Madison, Wis. (Brindley & Brewer, of Richland Center, Wis., and Richmond, Jackman, Wilkie & Toebaas, of Madison, Wis., of counsel), for appellee.

Before ALSCHULER, SPARKS, and FITZHENRY, Circuit Judges.

ALSCHULER, Circuit Judge.

Appellant complains of a judgment against it rendered in an action on two Wisconsin insurance policies it had issued, one on November 26, 1924, and the other May 8, 1931, on the life of one Melgard, who died March 21, 1933, as the result of a gunshot wound. Each policy provided that in case of assured's self-destruction during the first two years of the policy recovery thereon should be for only the premiums paid thereon, and each policy incorporated the two-year incontestability clause as required by the Wisconsin statute. Each policy contracted for double indemnity to be paid by appellant in case insured's death resulted directly and solely from accidental causes.

The face of the first policy ($3,000) was paid, and the action was brought for recovery of the face of the second policy ($10,000) and for the double indemnity under both policies ($3,000 and $10,000). The asserted defense was that as to the face of the second policy the death was caused by insured's suicide within two years from the policy's date; and, as to the claim for double indemnity, that the insured's death did not result directly and solely from accidental cause. The jury found for appellee in the full amount claimed, and judgment went accordingly.

Appellant insists that the record definitely, and without substantial contradiction, shows that the insured committed suicide within the two-year period, and, what in this case is practically the same thing, that the death did not result from accidental causes.

If we consider only the immediate physical facts attending this man's death, the conclusion that he was a suicide could quite easily be reached. The sound of a shot was heard in his home, and a few moments later he was found in the second floor spare chamber of the house lying on the floor with a gunshot wound through his skull, made by a bullet from his automatic pistol, which was found lying by his side with one of its cartridges discharged—and no other person appears to have been in the room.

It may be said that in any reasonable view of the evidence it must be concluded that the pistol was discharged through some sort of manipulation by or contact with the deceased. If, however, the record discloses substantial facts and circumstances tending to indicate that the manipulation or contact was without suicidal intent on his part, it cannot be said that the fact of suicide conclusively appears from this record.

The existence of a motive which might induce one to commit suicide is always looked for when the circumstances surrounding the death may suggest willful self-destruction, and of course such a motive may bear strongly on the conclusion to be reached. To be sure, suicide may so definitely appear that the existence or absence of a motive therefor would have no definite influence on the ultimate conclusion. But, in general, the entire absence of any motive for suicide may raise substantial doubt as to whether, in fact, the death was so caused, and in a close or doubtful case may supply the preponderating circumstance which will tip the scale in favor of the conclusion of accidental death.

The record here is singularly free from evidence of any motive which would tend

to induce this man to commit suicide. The only evidence of this nature whereon comment is made is the fact that he was considerably in debt. He had for quite a number of years been in the monument business, which in the few years preceding his death was evidently not very flourishing. He owed his brother about $8,000, secured by a mortgage on his stock of goods; and his other debts were considerable. But the undisputed evidence is that no creditor was pressing him, that his business was improving, and that he fully expected to work out of his financial difficulties. It does not appear that any demands had been made upon him, or that there were any judgments against him. Apart from his indebtedness, the record suggests absolutely nothing which would tend to indicate a motive for suicide or the existence of such an intent.

But the record fairly bristles with circumstances, brought down to almost the very moment of his death, strongly tending to reveal in him a state of mind quite the contrary. He was 38 years of age, married, and had two young children, and in his family relations appeared entirely happy. In the forenoon of the day in question he met an old friend, with whom he talked about going hunting the following month as soon as spring opened. Melgard joked his friend about smoking a pipe, and said he had made up his mind to quit using cigarettes and would himself take up the pipe again. He talked about exchanging his car for another one, and of improvement in his business, mentioning certain new prospects for monument sales, and of various other things which would suggest anything but a suicidal state of mind. He then stepped into a clothes cleaning shop to have a button sewed on his coat. Some days before he had ordered from the dentist a new set of upper and lower teeth, which were to be finally ready on that very day. The dentist testified that Melgard appeared very anxious to have them. He told his wife at noon he would go to the dentist that afternoon to see if he could get them. About noon, as was usual, he came home for lunch, bringing with him some groceries. He ate lightly, and his wife went upstairs to put their 3-year-old baby to bed. She came down, and he put on his overcoat, rubbers, and hat in evident preparation for returning to his shop, but first, as was his custom, he ran upstairs to tell the baby good-bye. His wife heard them laughing and talking, and very shortly thereafter heard the shot, and, going upstairs, she found him on the floor of the adjoining room.

There were yet other facts and circumstances of a similar nature, all without counter evidence, indicating, so far as outward facts may indicate, that up to almost the very time that the gun was discharged he remained in that "happy-go-lucky" state of mind to which his friends testified, without the remotest indication of any intent or purpose of ending his existence.

The gun was customarily kept in the drawer of an article of furniture in the guest room. Whether on that occasion he took the gun out of the drawer, or whether he was returning it to the drawer, there is no evidence. A witness testified to his having stated that he would use a gun on persons who had on several occasions drained his car of gasoline when he left it in the street. The gun was a small automatic affair of British make, which he had brought home from the World War. Its appearance indicated that it had long been loaded, the cartridges in it being considerably corroded. It was testified that on examination there appeared some rust on the inner parts, but it is doubtful whether this would have interfered with its proper working. There were locking devices designed to prevent its unintentional discharge.

There was a rug of considerable size in the guest room extending from the end of the bed toward the wall, and when he was found the rug was crumpled up at his feet as though it had been pushed forward on the floor as he fell. The floor was smooth, and the rug would easily have slipped; and on the floor was found a rather long mark which looked as though it might have been made by his rubber heel as he slipped, pushing the rug ahead of him.

Appellant's counsel suggests that, so far as the appearance of the rug and the floor might tend to indicate an accidental fall in which the gun was accidentally discharged, this arrangement of the rug might have been deliberately made by the deceased for the very purpose of indicating accident rather than suicide as the cause of death. But this very suggestion raises a countervailing inference of no inconsiderable weight. With no apparent immediate motive for making away with himself, if he were contemplating suicide of which he wished to leave no evidence, would he not have waited the forty-seven days which were yet lacking when the face of the larger policy would be secure beyond all attack by reason of the efflux of the two-year period and the incontestability clause? He was not a person without experi-

ence in insurance matters. It seems from the applications that he had a number of other life policies upon his life, and it is but fair to conclude that he knew of such provisions, which sellers of insurance are usually not slow in exploiting.

The gun was of peculiar construction, evidently designed for quick and effective action, and under this record it is not beyond the range of possibility, or even of probability, that the gun had been previously taken from its usual place either by deceased or possibly by one of his children, and that in undertaking to return it he slipped and it was accidentally discharged, with fatal effect.

Under all these circumstances, we cannot conclude, as a matter of law, that the record affords no substantial evidence to sustain the jury's verdict; and we cannot concur in appellant's contention that the record affords no substantial evidence that Melgard's death was the result of accident.

The only other alleged error which in our judgment merits consideration is that with respect to the court's charge on the subject of the presumption against suicide. The charge states that "the law raises a strong presumption" that the death was not due to suicide. Counsel object to the use of the word "strong." In appellee's brief a considerable number of authorities are referred to wherein the adjective "strong" is employed in stating this well-recognized presumption.[1] But while it seems to us that, with the very full and fair direction of the court in the remainder of the charge, the alleged error did not in any event work serious injury to appellant, it is apparent that appellant did not undertake at the proper time to correct any possible error in this respect. The record shows that, after the court had charged the jury, the defendant merely "excepted to the instructions, which were inconsistent with the defendant's requested instructions." There is nothing in this to direct the court's attention to the alleged improper employment of the word "strong." It is more than likely that, had this particular point been raised at the close of the charge, the court, had it

agreed with counsel, would have amended the charge accordingly. But the court was given no opportunity to do this, and the object of requiring exceptions to be taken before the jury retires is to enable the court to correct errors which may have unwittingly crept into the charge. This court has frequently so held in dealing with this proposition.[2] The court's attention to this proposition was not challenged by the statement that the exception was to so much of the charge as was inconsistent with instructions which the defendant had requested, especially as there was nothing in the requested instructions which conflicted with the employment of the word "strong" in the charge as given.

The judgment is affirmed.

---

[1] Fehrer v. Midland Casualty Co., 179 Wis. 431, 190 N. W. 910; Simmons Co. v. Industrial Comm., 211 Wis. 445, 248 N. W. 443; Cooley's Briefs on Insurance (2d Ed. 1928), p. 5458; Jones' Commentaries on Evidence (2d Ed.), Vol. 1, p. 418; State ex rel. Hawkins v. Industrial Comm., 157 Minn. 33, 195 N. W. 766, 36 A. L. R. 394; Neasham v. New York Life Ins. Co. (D. C. Nev.) 244 F. 556; Mutual Life Ins. Co. v. Hatten, 17 F.(2d) 889 (C. C. A. 8).

[2] Standard Accident Ins. Co. v. Van Altena, 67 F.(2d) 836; Strauss v. United States, 13 F.(2d) 122; Colbeck v. United States, 10 F.(2d) 401; Cohen v. United States, 277 F. 771; Glynn v. May, 271 F. 464; Weichen v. United States, 262 F. 941; Smith v. Hopkins, 120 F. 921.