No. 35,279

UNA SPENCE, *Appellee*, v. NEW YORK LIFE INSURANCE COMPANY, *Appellant*.

(118 P. 2d 514)

Opinion filed November 8, 1941.

*Robert Stone, James A. McClure, Robert L. Webb, Beryl R. Johnson* and *Ralph W. Oman,* all of Topeka, for the appellant.

*Donald C. Allen,* of Oskaloosa, *T. M. Lillard, O. B. Eidson* and *P. H. Lewis,* all of Topeka, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This was an action on the double indemnity clause of a life insurance policy. The jury answered special questions and returned a general verdict for plaintiff, upon which judgment was rendered. Defendant has appealed.

The pleadings may be summarized briefly as follows: On September 20, 1926, defendant issued its policy of insurance upon the life of Noel H. Spence, husband of plaintiff, who was named beneficiary, for $5,000 single or $10,000 double indemnity. The policy was in effect on September 7, 1939, on which date the insured and his son, Albert Spence, were working in and about a dry water well. Albert Spence descended into the well, and upon reaching the bottom, collapsed and died immediately from suffocation. The insured, being unaware of the collapse of his son, and in an attempt to rescue him, descended into the well and also died as a result of suffocation. Defendant has paid plaintiff $5,000 as single indemnity for the death of insured, but has refused to pay the additional sum of $5,000 due by reason of the fact that the death of the insured resulted from accident, as provided in the policy. A copy of the

policy was attached to the petition. The double indemnity provision, so far as material here, reads:

"The double indemnity provided on the first page hereof shall be payable upon receipt of due proof that the death of the insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental means and occurred within ninety days after such injury.

"Double indemnity shall not be payable if the insured's death resulted from self-destruction, whether sane or insane, from the taking of poison or inhaling of gas, whether voluntary or otherwise; . . ."

Defendant in its answer admitted the issuance of the policy; that a correct copy was attached to the petition; that it was in effect on September 7, 1939; that the insured died on that date, and that plaintiff had been paid the sum of $5,000 as single indemnity, and generally denied other allegations of the petition. It recited the pertinent exemption provision of the double indemnity paragraph of the policy and alleged the insured "came to his death as a result of inhaling gas, which cause is specifically excluded under the provisions of the double indemnity feature" of the policy. The reply specifically denied the last allegation of the answer.

The facts of the tragedy, not seriously controverted, are as follows: The insured owned a farm, occupied by a tenant, Mr. Peak, where there was a well, about four feet inside diameter, walled with limestone, twenty-nine feet deep, with about eighteen inches of water in the bottom. There was a windmill and pump at the well. About September 3, 1939, the pump was removed and ten gallons of muriatic acid was poured into the well. On the day of the tragedy the insured, his son Albert, his brother Lloyd, and Mr. Peak were replacing the pump when a part dropped into the well. There was a rope running through a pulley. Albert Spence put his foot into the loop of the rope and was let down to the bottom of the well, where he immediately collapsed. The insured slid down the rope to rescue his son, but before he started his brother Lloyd wet a hankerchief and tied it over his mouth and nose. When the insured reached the bottom of the well he stooped over to put the rope around his son, when he immediately collapsed. A doctor was called, who reached there in about fifteen minutes. The bodies were brought out of the well by means of hooks of some kind about an hour and a half after the tragedy. The doctor testified he thought he observed the insured breathing when he was first brought out of the well, but all efforts to resuscitate either of them failed.

The scientific evidence pertained to the cause of death. Doctor Lattimore, who had taken extensive pathological training, which involves the study of chemicals and the reaction of different chemicals when put together, gases, etc., testified he had made a test of the rocks taken from the bottom of the well, and by adding muriatic acid to such rocks carbon dioxide and hydrogen were the only gases given off; that hydrogen, being a lighter gas, would rise immediately, and carbon dioxide, which is 1.52 heavier than air, would sink down in confined places; that the main ingredients of air are oxygen, nitrogen, carbon dioxide, hydrogen, and a number of other gases in small amounts; that when human beings breathe in air and expel it from their lungs it contains more carbon dioxide than when breathed in; that there is carbon dioxide in the cells of the body at all times, and that it is the same gas contained in carbonated beverages, and that it is not, in its right amount or mixture, a deleterious gas; that in this respect it differs from carbon monoxide, potassium cyanide, and all cyanide gases, which cause a complete breakdown or paralysis of the tissues of the body; that a person getting as little as one percent of carbon monoxide in the tissues of the body would die; that he would not consider carbon dioxide as a poisonous gas in the sense that carbon monoxide or potassium cyanide gases are poisonous; that one in a place filled with carbon dioxide, and from which the oxygen is excluded, would die; that such death would be caused by asphyxiation, or suffocation; "it is a failure to get oxygen into the body"; that the result would be the same as though the person were submerged in water where no oxygen could get into the lungs. From all the facts shown the witness gave it as his opinion that the insured died of suffocation; the heavier gas, carbon dioxide, having excluded oxygen from the bottom of the well to the extent that he was unable to get enough oxygen to sustain life.

Doctor Taggart, who had made a special study of anesthetics, expressed the opinion that the breathing of carbon dioxide, highly concentrated, is deleterious to the extent that it becomes poisonous. In other respects his testimony, though phrased in different language, was to the same effect as that of Doctor Lattimore. On being asked upon all the facts what he regarded as being the cause of death he answered: "I would say that the immediate cause . . . was the presence of an excessively high concentration of carbon dioxide. I wouldn't exclude, understand, the absence of oxygen;" that the exclusion of oxygen would be a factor, and that the medical books de-

scribe death under those conditions as resulting from suffocation, meaning a failure to get a sufficient supply of oxygen.

As, we have seen, plaintiff alleged the insured died as a result of suffocation. The answer denied this and alleged that the insured came to his death as a result of inhaling gas. The scientific evidence was directed to those contentions. The court instructed the jury that if they found the death of the insured "was the result of unintentional suffocation, your verdict should be for the plaintiff." The court also instructed them if they found the death of insured "resulted from the inhalation of gas, your verdict should be for the defendant," irrespective of whether the gas was poisonous or nonpoisonous.

Answering special questions, the jury found carbon dioxide is a gas; that there was gas in the well at the time the insured descended into it; that the insured inhaled carbon dioxide gas while he was in the well; that if he had not gone to the bottom of the well, which was filled with carbon dioxide gas which he was compelled to breathe, he would not have died. And to the question, "What, if any, violent and external means of death were there?" answered, "Death by suffocation." ·

Defendant filed a motion for a new trial, also a motion for judgment in its favor notwithstanding the general verdict. Pending the hearing of these motions Judge Otis E. Hungate, who had presided at the trial, died. The motions were thoroughly briefed and argued to his successor, Judge Dean McElhenny, and were overruled in an exhaustive opinion which treated each phase of the case.

· Appellant contends the trial court erred, first, in overruling its motion, for a directed verdict made at the close of all the evidence; second, in refusing instructions requested; third, in the instructions given; fourth, in overruling the motion for a new trial; and, fifth, in overruling its motion for judgment notwithstanding the verdict.

Although approached from a different viewpoint, the first and fifth points argued present the same question, namely: Did the death of insured result from a cause which exempts appellant from liability under the double indemnity provision of the policy? This exemption provision, insofar as it applies to this case, reads: "Double indemnity shall not be payable if the insured's death resulted from . . . inhaling of gas . . ." Appellant argues the facts are not controverted; that the insured went into the well; he inhaled gas—the jury so found in answering a special question; the insured died; hence, it

is clear there can be no liability. This analysis overlooks the controverted question put in issue by the pleadings, namely: From what cause did the death of the insured result—suffocation, as alleged by plaintiff, or the inhaling of gas, as alleged by defendant? Obviously it is not material what the insured inhaled if his death did not result from his inhaling of it.

Appellant correctly argues that the words of contracts of insurance are to be construed according to the meaning of the terms used, and if it is clear and unambiguous its terms are to be taken and understood in their plain, ordinary and peculiar sense, citing *Imperial Fire Ins. Co. v. Coos County,* 151 U. S. 452, 14 Sup. Ct. 379, 38 L. Ed. 231; *Birss v. Order of United Commercial Travelers,* 109 Neb. 226, 190 N. W. 486; *Minner v. Accident Association,* 99 Kan. 575, 162 Pac. 1160, and other cases to the same effect. There is no trouble with this rule; in fact, the court gave an instruction in harmony with it which is quoted by appellant with approval. It is also a well-settled rule that where the provisions of an insurance policy result in ambiguity, inconsistency, or uncertainty, and are so worded or peculiar as to be open to different constructions, the one most favorable to the insured must prevail. See *Liberty Life Ins. Co. v. Guthrie,* 148 Kan. 907, 84 P. 2d 891. This rule specifically applies to language in a policy exempting the insurer from liability or forfeiting substantial rights of the insured. (*Sebal v. Columbian Nat. Life Ins. Co.,* 144 Kan. 266, 58 P. 2d 1108; 1 Joyce on Insurance, p. 574, and cases cited in those authorities.)

In *Minner v. Accident Association,* supra, relied upon by appellant, the clause of the policy exempted the insurer from liability if the death of the insured was ". . . caused by or resulting wholly or in part, directly or indirectly from . . . gas, . . . in any manner taken or administered, voluntarily or involuntarily . . ." Clearly the wording of this exemption clause is much broader than the one before us. And in *Birss v. Order of United Commercial Travelers,* supra, the exemption provision reads: "Benefits . . . shall not cover . . . any death . . . resulting from . . . inhaling of gas or asphyxiation (voluntary or involuntary, conscious or unconscious)." It will be noted this provision specifically covers asphyxiation. There is no such provision in the clause of the policy under consideration here. If the insurer desired to be relieved from liability when the death of the insured resulted from suffocation, it could have said so in language no one could misunderstand.

Appellant cites *Safe Deposit & Trust Co. v. New York Life Ins. Co.*, 14 F. Supp. 721. In that case the exemption provision in the policy of insurance was substantially like the one before us. In the petition it was alleged the insured died by asphyxiation from gas and fumes escaping from a lighted gas heater while the decedent was asleep in a hotel room. Upon a demurrer to the petition the plaintiff contended:

"The established meaning of the phrase 'to inhale gas' is limited to the act of breathing in gas; that the phrase 'voluntary or otherwise' does not extend the meaning of inhalation to include the unconscious reflex of breathing gas while asleep."

The trial court held against that contention and cited cases supporting that view under policies which did not have the words "whether voluntary or otherwise" in the exemption clause, and held that the addition of those words left that line of cases no longer authority. The decision was affirmed by the Circuit Court of Appeals, (*Safe Deposit & Trust Co. v. New York Life Ins. Co.*, 84 F. 2d 1011) "for reasons given in the opinion of the judge below, which is adopted as the opinion of this court." In the opinion of the trial court it was said, parenthetically, that the gas in question was carbon dioxide. No question was presented to the court such as was raised by the pleadings in this case, nor was any such question decided. Cases cited in the opinion as supporting the conclusion reached (*Northern Trust Co. v. Central Life Ins. Co.*, 274 Ill. App. 551; *Diamond v. New York Life Ins. Co.*, 286 N. Y. S. 625, and *King v. New York Life Ins. Co.*, 72 F. 2d 620) each involved the inhaling of carbon monoxide gas, but the decision in each turned upon the question whether or not the gas was voluntarily inhaled. *Vaughan v. Gulf Life Ins. Co.*, 64 Ga. App. 590, 13 S. E. 2d 715, turned upon a consideration of the same question. The kind of gas is not designated further than it was alleged to have been a poisonous gas from which the insured died immediately upon breathing it. This excludes the idea that it was carbon dioxide.

In *Osburn v. Commercial Travelers Mutual Accident Association of America*, 265 N. Y. 671, 193 N. E. 438, it appears the death of the insured was caused by his inhaling carbon monoxide gas while working on his car in a closed garage with the engine running. It was stipulated he died from the effects of carbon monoxide poisoning. Defendant relied upon a provision of the policy exempting liability somewhat like the one involved here, but to which was added, "or

to voluntary exposure to unnecessary danger, or negligence of the insured." The lower court dismissed the complaint, and this was affirmed by the court of appeals with a memorandum only.

In *Rasmussen v. New York Life Ins. Co.*, 267 N. Y. 129, 195 N. E. 821, the action was to recover upon the double indemnity feature of a policy, the exemption provision of which was worded identically with the one here involved. In the trial court plaintiff offered evidence tending to show that in 1927 defendant had printed a pamphlet which it furnished its agents for use in soliciting insurance, which in part stresses the double indemnity feature of the policy, stating the amount double indemnity had added to policy payments, giving causes for which such payments had been made, and among others, "carbon monoxide 16," and this was exhibited to the insured at the time the policy was solicited in 1928. The trial court excluded this evidence. The court of appeals reversed it for that reason, saying the document offered is "probative of the fact that the general words of this policy were used by both insurer and insured to connote accidental death by carbon monoxide as among the contingencies in which double indemnity would be paid."

There was no attempt made in this case to show that a similar pamphlet was submitted or argument made to the insured at the time the policy in question was solicited, hence the question has no direct bearing in this case. (*Feldstein v. New York Life Ins. Co.*, 23 N. Y. S. 2d 108; affirmed by Court of Appeals, 35 N. E. 2d 924.)

We have examined all of the cases cited by counsel and in none of them in which recovery was denied was the question presented by the pleadings in this case, and tried out, either presented or determined.

Most of the criticisms relating to instructions arise from the fact that the court did not follow defendant's theory, as above stated. These criticisms need no further discussion. Complaint is made that the court did not give a requested instruction of the meaning of the term, "through external, violent and accidental means." On this point the court did instruct the jury that if the death of the insured "was caused by suffocation, not intentionally inflicted by him, or by unintentionally inhaling gas, that death by either of these means would constitute external, violent and accidental means." Appellant argues this was erroneous. We think it accords with the great weight of authority. (*U. S. Mutual Accident Association v. Newman*, 84 Va. 52, 3 S. E. 805; *Fehrer v. Midland Casualty Co.*,

179 Wis. 431, 190 N. W. 910; *Paul v. Travelers' Ins. Co.*, 112 N. Y. 472, 20 N. E. 347; 3 L. R. A. 443.) The same rule applies to drowning. (*Baciocco v. Prudential Ins. Co.*, 22 F. 2d 700; *Anderson v. Inter-State Accident Ass'n*, 354 Ill. 538, 188 N. E. 844; *Woods v. Standard Acc. Ins. Co.*, 166 Wis. 504, 166 N. W. 20.) Defendant also requested an instruction to the effect that if the insured, knowing his son had collapsed in the well, voluntarily went into it and suffocated, that his death was not accidental. We think the court correctly instructed the jury on this point:

"That, by the term 'accident' is meant an undesigned, untoward and unlooked for event, which is not expected nor designed. 'Accidentally' means by way of or produced by accident."

There is no room in this case for a finding that the insured purposely took his own life. Indeed, there is no serious contention that was true.

Appellant argues the court erred in overruling its motion for a new trial, which was upon the grounds, among others, that the verdict of the jury was given under the influence of prejudice and that it is contrary to the evidence. It is argued the fact that the jury returned a general verdict for plaintiff and answered special questions as they did is evidence of their prejudice, which required the granting of a new trial. We think the point lacks merit. An argument of that kind could be made by practically every defeated litigant where there was a trial by jury. Upon the question of whether the verdict was sustained by the evidence, we think there is an abundance of evidence to sustain the special finding of the jury that the insured's death was caused by suffocation, and to justify a verdict for plaintiff. Appellant's argument on this point is really embodied in its fundamental theory of the case.

We find no error in the record. The judgment of the court below is affirmed.

THIELE, WEDELL and ALLEN, JJ., dissent.