## METROPOLITAN LIFE INS. CO. v. BROYER.

Circuit Court of Appeals, Ninth Circuit.
July 18, 1927.

Rehearing Denied September 6, 1927.

No. 5094.

**1. Insurance ☞646(6)—In action on accident policy, plaintiff must show that means of injuries were accidental:**

In action against insurer by beneficiary, under accident policy covering death from bodily injuries caused by violent and accidental means, plaintiff was obliged to prove that means were accidental.

**2. Insurance ☞659(1)—In determining whether death by gas asphyxiation was by accidental means, jury may consider whether circumstances showed reason for insured's suicide.**

In action on accident policy for death of insured by gas asphyxiation, jury may, in determining whether means of injury was accidental, consider whether circumstances would indicate cause for suicide.

**3. Insurance ☞646(7)—There is presumption that asphyxiation of one insured under accident policy was accidental, and not suicide.**

Where one insured under accident policy died of gas asphyxiation, there is presumption that he did not commit suicide, but that turning on of gas was accidental, and that death occurred by accidental means.

**4. Insurance ☞646(7)—Evidence held insufficient to overcome presumption that asphyxiation of one carrying accident insurance was not suicide.**

In action under accident policy for death of insured by gas asphyxiation, evidence *held* insufficient to overcome presumption that insured did not commit suicide.

**5. Insurance ☞646(6)—In action under accident policy, plaintiff, having shown occurrence of death in way pointing to accident, need not disprove other causes.**

In action under accident policy, plaintiff, suing for death of insured, having introduced evidence that death occurred in such way as naturally pointed to accident, was not bound to disprove negatively other causes of death.

**6. Insurance ☞455 —Death from injuries caused by gas asphyxiation satisfies requirement of accident policy requiring death by violent and accidental means.**

In action on accident policy, instruction that death resulting from bodily injury, caused directly and independently of all other causes by gas asphyxiation, satisfied requirement that death must be caused by violent means, *held* not error, since death under such circumstances was accidental, if gas was turned on unintentionally, and violent, in that gas was external force causing death.

**7. Insurance ☞669(11)—Charge that accident policy did not insure against violent death, but only against death by violent means, held properly refused.**

In action under accident policy, refusal of charge that policy did not insure against violent death, but only against death by violent means, *held* proper, where death was caused by gas asphyxiation.

**8. Trial ☞252(14)—In action under accident policy for death by asphyxiation, refusal of instruction that death in ordinary course of nature is presumed held not error.**

In action under accident policy for death of insured by gas asphyxiation, refusal of instruction that there is presumption that deceased died according to ordinary course of nature and ordinary habits of life *held* not error, being irrelevant under undisputed fact that insured was asphyxiated.

In Error to the District Court of the United States for the Northern Division of the Northern District of California. Frank H. Kerrigan, Judge.

Action by Alice L. Broyer, as administratrix of the estate of Alexander Henry Broyer, also known as Al. H. Broyer, deceased, against the Metropolitan Life Insurance Company. Judgment for plaintiff, and defendant brings error. Affirmed.

F. Eldred Boland and Knight, Boland & Christin, all of San Francisco, Cal., for plaintiff in error.

Stephen W. Downey and Downey, Brand, Seymour & Dunn, all of Sacramento, Cal., for defendant in error.

Before HUNT, RUDKIN, and DIETRICH, Circuit Judges.

HUNT, Circuit Judge. Writ of error by the insurance company to review a judgment entered upon a verdict in favor of Alice L.

Broyer, as administratrix of the estate of her husband. The action was upon a policy of accident insurance, which provided for the payment to the estate of Broyer of $15,000 in the event his death resulted from "bodily injuries sustained while this policy is in force, caused directly and independently of all other causes, by violent and accidental means." The insurance company defended upon the ground that the facts surrounding Broyer's death failed to show that death was due to violent and accidental means.

On the morning of September 23, 1925, Broyer, an attorney and business man, about 40 years old and in good health, was found dead in a gas-filled room in a hotel in Sacramento. The windows of the room were closed and the shades were drawn. In the same room at the same time one Lehners was found near death, but was revived.

About March, 1925, Broyer acquired 49 per cent. of the stock of an advertising company of which Lehners was proprietor. Mrs. Broyer had 2 per cent. and Lehners retained 49 per cent. In arranging his finances at that time, Broyer borrowed some stocks and bonds from his mother, part of which securities he hypothecated for a loan of $18,000. He checked out about $12,000 and left approximately $6,000 in the business. A corporation was formed, with Broyer president, Lehners vice president, and Mrs. Broyer secretary. Between March and August, because of friction, Lehners withdrew from the corporation and turned over to Mrs. Broyer whatever interest he had in the company, taking an option back. At that time, although collections had not been made, the book values were in fair condition. From time to time thereafter Lehners and Broyer met. There was no enmity between them. On September 22d Broyer proposed to Lehners that he rejoin the company. Together they went to several places and drank liquor. In the evening they went to Lehners' room at the hotel, where they discussed business affairs generally, ways and means for raising money on certain stock that Broyer had, upon which the bank had said it would advance more money, if they wanted it, and the contract of purchase of two Hudson automobiles.

In the course of the evening, Lehners left the room, and upon his return noticed that the windows and shades had been drawn. He spoke of it to Broyer, who replied that people had come into the room across the court, and as their windows and shades were up, because of the liquor on the bureau, and of not knowing who the people were, he thought it better to close the windows. Lehners

opened the windows, but left the shades drawn. Lehners soon again went out of the room, but on his return paid no attention to the windows or shades. Once more he left the room and returned. At that time Broyer was standing by the telephone. Lehners said that as he entered he heard the telephone bell click, but he thought nothing further of it than that probably Broyer had been trying to get a number or had telephoned to some one. He said that Broyer then poured two drinks; that they went to the wash basin, which was just beyond the telephone, where they drank the whisky and some ice water; that he then sat on a small chair at the foot of the bed, while Broyer sat in a large rocking chair near the small table; that the last thing he remembers was the discussion of the automobile contract. Lehners described the gas jet as being directly over the telephone, and being shaped like a gooseneck, "very much like an ornamental hook." His recollection was that the telephone directory was hanging on the gas jet. He pictured Broyer as a nervous man, who, in conversation, would often fumble his watch chain, or play with whatever "happened to be handy."

The room was a small one on a court about 19 feet wide. It had a clothes closet, a double bed, and between the bed and windows were a table and two chairs; on the right, as one entered, was a recessed wash basin. The telephone was 60 inches from the floor, and the gas jet, with the stopcock underneath, was 8 inches above the telephone. Next on the right wall was the dressing table, and beyond that the windows.

Both men removed their coats before discussing their affairs. They had two bottles of whisky. When the men were found, the windows and shades were drawn, and the stopcock of the gas jet was turned on full. There was no indication of a scuffle or fight. Broyer's body, fully dressed, except his coat and vest, was lying on the bed. A witness testified that it looked as if Broyer had laid down to sleep. Lehners was found sitting on the floor, with one arm resting on the edge of the bed. He was dressed, except for coat, shoes, and collar.

It was proven that at some time between 6 and 7 o'clock in the evening, when the two men were going to one of the places where they tried to obtain liquor, they met Mrs. Broyer, who asked her husband to get into their automobile and go to Roseville. He refused, and, when she asked him when and

where she would see him again, he answered, "Probably in the morgue," or words to that effect. Mrs. Broyer left, and later, after obtaining two bottles of whisky, the men went to the hotel room above described.

The immediate cause of Broyer's death was gas asphyxiation, not a natural cause. The gas which caused his death came from the jet found open when his body was discovered, and it is indisputable that, if Broyer voluntarily and intentionally turned on the gas, his death was not caused by violent or accidental means, in which event there could be no recovery under the terms of the policy. On the other hand, if the gas was turned on unintentionally or accidentally, whether by Broyer or by Lehners, then the means which caused Broyer's death were violent and accidental within the terms of the policy, and recovery could be had. Joyce on Insurance, § 2881.

[1-4] Plaintiff below was obliged to prove that the means were accidental. Plainly, therefore, there was involved the inquiry whether or not Broyer purposely and intentionally turned on the gas. As bearing upon the issue, it was for the jury to consider whether the circumstances showed reason for Broyer to desire death; whether his affairs appeared to be in a condition of embarrassment to him; whether or not there were family cares which might have made him despondent inciting in him an impulse to end his life; what, if anything, he meant when he told his wife that she might see him in the morgue; and whether or not Lehners told the truth when he said that Broyer explained that he shut the windows because other guests could look into the room and see the liquor on the bureau. The presumption is that Broyer did not commit suicide, and we cannot say that the jury erred in concluding that that presumption was not rebutted. Travelers' Ins. Co. v. McConkey, 127 U. S. 667, 8 S. Ct. 1360, 32 L. Ed. 308; International Life Ins. Co. v. Carroll (C. C. A. 6) 17 F. (2d) 42. It seems incredible, too, that if Broyer intended to destroy himself he would allow Lehners to remain in the room, where there would be every probability of his being asphyxiated.

[5] The applicable presumption of law is that the turning on of the gas cock was accidental, and that Broyer's death occurred by accidental means. Tabor v. Mutual Life Ins. Co. (C. C. A.) 13 F.(2d) 765; Mutual Life Ins. Co. of N. Y. v. Hatten (C. C. A.) 17 F.(2d) 889. What happened while Lehners was out of the room could not be conclusively proven, but plaintiff brought forward evidence that death occurred in such a way as naturally pointed to accident. She was not bound to disprove negatively other causes of death. Were this not true, there would be many cases involving policies against death by accidental means where no recovery could be had. The jury may have inferred that Broyer, while at the telephone, nervously reached up, and, without meaning to do so, turned on the gas cock; or, that in pulling the telephone directory, which hung on the gas jet, he may have turned on the cock; or that in going to the basin he may have staggered and laid hold of the jet, and unintentionally turned on the cock; or that his senses may have been so muddled that he turned on the cock, believing it was the switch for the electric lights. Any one of the circumstances enumerated is inferable, and warrants the conclusion that the gas cock was opened by Broyer with no intention of turning on the gas. United States Fidelity & Guaranty Co. v. Blum (C. C. A.) 270 F. 946; Mutual Life Ins. Co. v. Hatten (C. C. A.) 17 F.(2d) 889; Beach on Insurance, § 250.

[6, 7] Error is assigned to the instruction stating that death resulting from bodily injuries caused directly and independently of all other causes by gas asphyxiation satisfies the requirements of the policy that death must be caused by violent means; also to the refusal of the court to charge that the policy does not insure against violent death but only against death effected by violent means; that a differentiation is to be made between the result to the insured—that is, death—and the means which are the operative cause of producing that result; that it is not enough that death should be violent, but that there must be some element of violence in the preceding act or occurrence which leads to death.

The argument, as we understand it, is that the means of the death of Broyer was the turning on of the gas cock, and that to recover the turning on must have been accidental and violent. We agree with the construction put upon policies like that under consideration holding that death occasioned by asphyxiation, as would be death by drowning, when such casualty is not intended by the deceased; is due to injuries effected through external, violent and accidental means. Cornelius on Accidental Means, p. 65. Broyer's death was accidental, in that the gas was turned on without intent on his

part to let the gas escape; his death was violent, in that the gas was an external force that caused his death. In Paul v. Travelers' Insurance Co., 112 N. Y. 472, 20 N. E. 347, 3 L. R. A. 443, 8 Am. St. Rep. 758, in a suit on an accident policy where a guest at a hotel was found dead, with no external or visible sign upon the body, but with the gas turned on, the court said: "As to the point raised by the appellant that the death was not caused by external and violent means, within the meaning of the policy, we think it sufficient answer that the gas in the atmosphere as an external cause was a vio- lent agency, in the sense that it worked upon the intestate so as to cause his death. That a death is the result of accident, or is un- natural, imports an external and violent agency as the cause." American Accident Co. v. Reigart, 94 Ky. 547, 23 S. W. 191, 21 L. R. A. 651, 42 Am. St. Rep. 374; Horton v. Travelers' Insurance Co., 45 Cal. App. 464, 187 P. 1070; McGlinchey v. Fidelity & Guaranty Co., 80 Me. 251, 14 A. 13, 6 Am. St. Rep. 190; Boyor McDonald v. Refuge Assurance Co., 17 Court of Sessions Cases, 955. We find no error in the instruc- tion given, nor in the refusal to give the re- quested instruction.

[8] It is also said that the court erred in refusing to instruct that there is a presump- tion that things happen according to the or- dinary course of nature and habits of life; that it was to be presumed that Broyer died according to the ordinary course of nature and the ordinary habits of life; that is, that his death was natural; and that in the ab- sence of a preponderance of the evidence that he met death by injuries sustained by accidental means and by violent means, as such terms were defined in the instructions, the verdict must be for the insurance com- pany. The special ground of error urged is that, although the court gave to the jury a definite idea that there was a presump- tion against suicide, no idea was conveyed that things happen according to the ordi- nary course of nature and the ordinary hab- its of life.

The undisputed fact that Broyer was asphyxiated, and the view that such a cause of death was unnatural, rendered the request- ed instruction irrelevant. If there had been an issue whether Broyer's death occurred through natural or unnatural causes, then an instruction embodying the principle in- cluded in the request would have been ap- propriate. The idea that it is to be pre- sumed that Broyer closed the windows and

purposely turned on the gas, as in the or- dinary habits of life, seems to us to be but another way of saying that it is to be presumed that he intentionally destroyed himself. We think the court was correct in refusing the request.

The judgment is affirmed.