**JENSMA v. SUN LIFE ASSUR. CO. OF CANADA et al.**

No. 6932.

Circuit Court of Appeals, Ninth Circuit.
April 3, 1933.

Richards & Haga, Oliver O. Haga, McKeen F. Morrow, and J. L. Eberle, all of Boise, Idaho, and D. L. Rhodes, of Nampa, Idaho, for appellant.

Scatterday & Stone, of Caldwell, Idaho, and Graves, Kizer & Graves, of Spokane, Wash., for appellees.

Before WILBUR, SAWTELLE, and MACK, Circuit Judges.

SAWTELLE, Circuit Judge.

This is an appeal from a judgment in favor of the defendants-appellees in two law actions brought by the plaintiff-appellant to recover from the appellees sums alleged to be due under policies of insurance covering the death of her husband, Cornelius P. Jensma, from bodily injuries alleged to have been suffered solely "through external, violent and accidental means."

By agreement of the parties, the two causes were consolidated for trial and for hearing on the same record and briefs on appeal. The cases were tried by the court; a

458

jury trial being expressly waived in writing.

The appellant's original complaint alleged that a physician "administered to the said insured a hay fever treatment (manufactured, designed and intended to be a treatment for the prevention and cure of hay fever), by injecting into the body of the insured a hay fever pollen extract, which said extract, without the knowledge, fault or negligence of the said Samuel A. Swayne [the physician] or of the said insured, contained the spores of an anaerobic gas producing organism, and from the effects of which the said insured did die."

During the trial, after a witness for the appellant had testified that the infection might have come from an infected garment worn by the insured, or from other sources that will be discussed later, the appellant obtained from the court permission to amend her complaint to read that the physician "administered or caused to be administered to the said insured a hay fever treatment (the extract used in said treatment manufactured, designed and intended to be a treatment for the prevention and cure of hay fever) by injecting into the body of the insured a hay fever pollen extract, and in so doing or as a result of which, without the knowledge, fault or negligence on the part of the insured, the spore or spores of an anaerobic gas producing organism entered the body of the insured, from the effect of which the insured did die," etc. A continuance was granted to the appellees that they might have an opportunity to meet the amendment.

The appellant requested the court below to make, among others, the following conclusion of law: "6. That plaintiff is entitled to judgment according to the prayer of her complaint." This request was denied.

Having refused to make the findings of fact and conclusions of law requested by the appellant, and having duly allowed the appellant exceptions to such refusal, the court below entered special findings of fact and conclusions of law in each of the causes, the findings in each case being the same.

The present controversy centers around finding No. IV, which was given as requested by the appellees, and was as follows: "On the 28th day of May, 1930, the insured Cornelius P. Jensma, caused a nurse to inject into his upper arm a serum made of pollen extract diluted with certain liquids. In making this injection the nurse used a hypodermic syringe which was partially filled with the serum. An infection caused by an anerobic

gas-producing bacillus resulted, of which the insured died on the 31st day of May, 1930. There is no evidence respecting the time when the infection occurred, and the court is unable to determine from the evidence as to when it did occur. The nature of the infection was not discovered until at least two days after the injection was made. There is no evidence sufficient to establish the source of the infection which caused the injury complained of. The plaintiff's witness referred to all the possible sources of infection which were involved in the operation, and drew the conclusion that since an infection occurred it must have come from one of these sources. The sources thus referred to were the needle, the syringe, the extract, the surface of deceased's arm, the nurse's hands, and a contaminated substance touching the abrasion made by the injection after the operation was completed. The court finds that of these sources thus suggested the pollen extract was not the source of the infection, and that the needle and syringe were also not the source of the infection. It finds that the source of the infection was either the surface of the deceased's arm, or some substance unknown which, after the completion of the operation, came in contact with the abrasion left by it, or came in contact with the wound left by the scratching off of the small scab covering this abrasion, or came from some source undisclosed and not suggested by either party."

The appellees concede that even in a case of this character the appellate court has the power to consider the evidence, but insist that such examination must not go farther than to inquire "whether there is any evidence to support the findings and whether the findings support the judgment."

This is unquestionably the law. In Dooley v. Pease, 180 U. S. 126, 131, 132, 21 S. Ct. 329, 331, 45 L. Ed. 457, the court said:

"Where a case is tried by the court, a jury having been waived, its findings upon questions of fact are conclusive in the courts of review, it matters not how convincing the argument that upon the evidence the findings should have been different. Stanley v. Supervisors [of Albany County], 121 U. S. 547, 7 S. Ct. 1234, 30 L. Ed. 1000, 1002.

"Errors alleged in the findings of the court are not subject to revision by the circuit court of appeals, or by this court, if there was any evidence upon which such findings could be made. Hathaway v. National Bank, 134 U. S. 498, 10 S. Ct. 608, 33 L. Ed. 1004, 1006; St. Louis v. Rutz, 138 U. S. 241, 11 S. Ct. 337, 34 L. Ed. 941, 946; Runkle v.

Burnham, 153 U. S. 225, 14 S. Ct. 837, 38 L. Ed. 694, 697."

See, also, 28 USCA §§ 773 and 875; Blanchard v. Commercial Bank of Tacoma (C. C. A. 9) 75 F. 249, 252, 253; Wolff v. Wells, Fargo & Co. (C. C. A. 9) 115 F. 32, 34; Societe Nouvelle d'Armement v. Barnaby (C. C. A. 9) 246 F. 68, 71, 72.

We will therefore test the foregoing finding No. IV according to the rule laid down in section 875, supra; namely, "when the finding is special the review may extend to the determination of the sufficiency of the facts found to support the judgment." We will also inquire whether, under the undisputed testimony, there was any substantial evidence upon which the lower court might have based an assumption that the infection from which the insured died was caused by other than "external means." Finally, we will endeavor to determine whether, as a matter of law, the finding of the lower court, on its face, does not establish the fact that the "means" were "accidental."

If we find that the means whereby the fatal infection was transmitted to the insured were both "external and accidental," the appellant must be held to have made out her case; for the appellees admit that, as to the third element required by the policy—namely, that of "violence"—"the authorities are uniform in holding that any degree of force is sufficient to satisfy the provisions of the policy that the means must be 'violent.'" This is a correct statement of the law.

First, were the means external?

It will be observed that the lower court found neither the pollen extract nor the needle and syringe to be the source of infection, but "that the source of the infection was either the surface of the deceased's arm, or some substance unknown which, after the completion of the operation, came in contact with the abrasion left by it, or came in contact with the wound left by the scratching off of the small scab covering this abrasion, or came from some source undisclosed and not suggested by either party."

In our view of the case, it is unnecessary to rehearse the evidence here. Suffice it to say that, relative to the court's finding as to the pollen and the needle and syringe, the evidence on that point was conflicting, and the finding cannot be disturbed.

At this juncture the court's finding seems to be largely one of conjecture. The suggestion concerning the infection's originating on the surface of the decedent's arm apparently was based upon a statement by Dr. Ernest E. Laubaugh, a witness for the appellant, who answered in the affirmative a question whether the lethal spores "might have been injected either from the surface of the arm, which was improperly or incompletely sterilized, or coming in contact with the vials, when her [the nurse's] hands were improperly or incompletely sterilized, or from the nurse's hands in pinching the flesh, * * * as well as getting in the syringe through this pollen extract."

Similarly, there is some slight evidence to support both the other affirmative conjectures made by the court; namely, that the source of infection was either "some substance unknown" which, after the completion of the operation, came in contact with the abrasion, or came in contact with the wound left by the scratching off of the small scab covering this abrasion.

Dr. Laubaugh testified that, after the injection, it might be very possible for a patient to rub "into that arm some of the same spore that had remained there, or the infection of a week or many days' standing." Dr. Laubaugh had previously answered in the affirmative a question whether the spores could rest dormant in a shirt, even after it had been "washed in the ordinary laundering process."

Vague as they are, all the foregoing conjectures of the court rest upon some testimony to be found in the record. All point inescapably to infection from some external means. All are in accord with the conclusion of Dr. Robert F. E. Stier, a witness heavily relied upon by the appellees, who declared: "It was probably introduced from the outside, probably after the injection."

We have carefully read the record, and nowhere in it can we find evidence to warrant any assumption that the infection could have come from within the decedent's own body.

Finally, we come to the closing portion of the court's finding: "* * * Or came from some source undisclosed and not suggested by either party."

We do not regard this as a finding at all. It is not based upon the record before this court.

We believe that the appellant has established, even according to the court's finding itself, that the source of infection was external. That is all which the policy requires; it does not designate some specific type of external source.

Nor does the law itself exact such a degree of particularity in a case of this kind. We recall the oft-quoted words of Mr. Justice Cardozo, who, while on the appellate bench of New York, in the case of Lewis v. Ocean Accident & Guarantee Corp, Ltd., 224 N. Y. 18, 120 N. E. 56, 57, 7 A. L. R. 1129, used the following language: "Here, as elsewhere, the law contents itself with probabilities, and declines to wait for certainty before drawing its conclusions."

We advert next to the third and last element required of the means of infection to bring it within the coverage of the policy; namely, that it must be "accidental."

There is a sharp conflict in the books as to the definition and application of the term "accidental" in connection with insurance policies of the kind that we are now considering.

The appellant thus states the view upon which she relies: "Under the authorities, it is sufficient that these virulent and poisonous germs were introduced into the body of the decedent without design or intention and without being the natural or normal result of a very simple and trivial operation performed a million times a year without such results. The contact of the germs with the tissues of the decedent, under the circumstances, constitutes a bodily injury which was accidental, unforeseen and wholly unexpected and unanticipated. * * *"

On the other hand, the position of the appellees is thus stated in their brief: "An infection resulting from an operation voluntarily submitted to by the assured does not fall within the protection of accident policies insuring against death by violent, external and accidental means."

With the line of disagreement thus clearly drawn, it is our task to ascertain which view is sanctioned by the weight of authority, in the federal courts, at least.

■ At the outset it is well to remember that, in the language of the late Mr. Chief Justice Taft: "It is a well-settled rule in the construction of insurance policies of this character, which the insured accepts for the purpose of covering all accidents, to construe all language used to limit the liability of the company, strongly against the company." Manufacturers' Accident Indemnity Co. v. Dorgan (C. C. A. 6) 58 F. 945, 956, 22 L. R. A. 620.

See, also, Railway Mail Ass'n v. Dent (C. C. A. 8) 213 F. 981, 983, 984, L. R. A. 1915A, 314.

One of the earliest cases on the subject decided by a federal court does not seem to have been discussed in the briefs. It is the case of McCarthy v. Travelers' Ins. Co. (C. C. Wis.) Fed. Cas. No. 8,682, decided in 1878. In that case the policy provided for the insurance company's liability in the event of injuries effected through external, violent, or accidental means. It was claimed for the plaintiff that the decedent, while exercising with Indian clubs, ruptured a blood vessel in his lungs, and that his death was the result of such injury. There was evidence tending to show that one of the clubs struck against a stove, thus causing the injury. In charging the jury, the court said: "But, if while engaged in such exercise there occurred any unforeseen, accidental or involuntary movement of the body of the deceased, which, in connection with the use of the clubs, brought about the injury; or, if there occurred any unforeseen or any unexpected circumstance which interfered with or obstructed the usual course of such exercise, and there was thereby produced an involuntary movement, strain or wrenching, by means of which the injury was occasioned, that would be an accident within the spirit of this policy; that is, the means by which the injury was effected would in such case be accidental."

So in the instant case. The decedent voluntarily submitted to the injection. But the introduction of the death-dealing organisms into his system was an "unforeseen or unexpected circumstance which interfered with or obstructed the usual course of" the treatment to which he had thus voluntarily submitted.

More than one decade after the McCarthy decision, supra, the leading case on the subject was decided by the Supreme Court of the United States. We refer to United States Mutual Accident Association by Barry, 131 U. S. 100, 121, 9 S. Ct. 755, 762, 33 L. Ed. 60, where the pertinent language of the policy was virtually identical to that now being considered by us. There the decedent, a physician, 30 years of age, and in robust health, in company with two of his colleagues, jumped from a platform four or five feet from the ground. The other two doctors alighted safely, but Dr. Barry landed heavily, suffered a stricture of the duodenum, and died 9 days afterward. The court said: "It is further urged that there was no evidence to support the verdict because no accident was shown. We do not concur in this view. The two companions of the deceased jumped from the same plat-

form, at the same time and place, and alighted safely. It must be presumed not only that the deceased intended to alight safely, but thought that he would. The jury were, on all the evidence, at liberty to say that it was an accident that he did not. The court properly instructed them that the jumping off the platform was the means by which the injury, if any was sustained, was caused; that the question was, whether there was anything accidental, unforeseen, involuntary, unexpected, in the act of jumping, from the time the deceased left the platform until he alighted on the ground; that the term 'accidental' was used in the policy in its ordinary, popular sense, as meaning 'happening by chance, unexpectedly taking place, not according to the usual course of things, or not as expected;' that, if a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it cannot be called a result effected by accidental means; but that if, in the act which precedes the injury, something unforeseen, unexpected, unusual occurs which produces the injury, then the injury has resulted through accidental means. The jury were further told—no exception being taken—that, in considering the case, they ought not to adopt theories without proof, or substitute bare possibility for positive evidence of facts testified to by credible witnesses; that where the weight of credible testimony proved the existence of a fact, it should be accepted as a fact in the case; but that where, if at all, proof was wanting, and the deficiency remained throughout the case, the allegation of fact should not be deemed established."

■ Applying the foregoing principles to the instant case, we find that on Wednesday morning, when the injection was administered, the insured was in good health. Immediately after the injection, there was a red spot about the size of a quarter at the site. Thursday afternoon the decedent came home from his office and complained of his arm. Thursday night the area of redness around the point of injection had increased to "about the size of a dollar," and there was some swelling. The decedent was then taken to the hospital. Friday morning the area of redness had increased; there was more swelling; "there was a general toxemia"; the patient was "blue, as from poor circulation, and his arm was markedly discolored." Friday afternoon the arm had practically doubled in size; the swelling had increased both up and down the arm, and had gotten to the joint. At 11 o'clock that night the arm was

opened and drained. The gas had extended beyond all hope of amputation. A counteracting serum was administered immediately after the operation. The insured died the following evening, Saturday, at 8 o'clock.

The above testimony was undisputed. In our opinion, it establishes a complete and unbroken chain of causation between the injection and the death of the insured—a result that was quite unforeseen at the time the simple hypodermic treatment was administered to him. It is true that we are unable to say at what instant of time the gas-producing organisms fastened themselves upon the victim's tissues; but there can be no doubt that they entered over the trail blazed by the hypodermic needle. Such entry caused blood poisoning; blood poisoning caused the death. "The cause of the cause is the cause of the effect."

Search as we may, we can find no suggestion of any efficient or proximate cause or means of the death other than the injection and the resulting infection. In the present advanced state of medical science, such a tragic result from a simple hay-fever injection is "unforeseen, unexpected, unusual." As we have already intimated, we need not know at what precise instant of time, by what precise instrumentality, or through what precise avenue the deadly organisms entered the insured's body; for it is in the very nature of an accident that its exact causes should not be susceptible of mathematical demonstration.

All the substantial evidence requires the conclusion that death was the result of violent, external, and accidental means, and there is no substantial evidence to the contrary, and therefore, the jury having been waived, judgment should have been entered for the appellant.

■ The appellees insist that "the death sued on must have occurred as a direct result of a bodily injury effected through accidental means, and it will not suffice if it merely appears that it was accidental in the sense that it could not reasonably have been anticipated."

This contention was well disposed of by Judge Sanborn in Western Commercial Travelers' Ass'n v. Smith (C. C. A. 8) 85 F. 401, 405, 406, 40 L. R. A. 653: "On the other hand, an effect which is not the natural or probable consequence of the means which produced it, an effect which does not ordinarily follow and cannot be reasonably anticipated from the use of those means, an effect which the actor did not intend to pro-

duce and which he cannot be charged with the design of producing under the maxim to which we have adverted, is produced by accidental means. It is produced by means which were neither designed nor calculated to cause it. Such an effect is not the result of design, cannot be reasonably anticipated, is unexpected, and is produced by an unusual combination of fortuitous circumstances; in other words, it is produced by accidental means. [Chicago, St. P., M. & O.] Railway Co. v. Elliott, 12 U. S. App. 381, 386, 387, 389, 5 C. C. A. 347, 350, 351, 353, 55 F. 949, 952, 953, 955 [20 L. R. A. 582]."

The same principle was adhered to by Judge Parker in Mutual Life Insurance Co. v. Dodge (C. C. A. 4) 11 F.(2d) 486, 488, 59 A. L. R. 1290, certiorari denied 271 U. S. 677, 46 S. Ct. 629, 70 L. Ed. 1147. In that case the insured's death resulted from paralysis of the respiratory center, caused by the local administration of a drug known as novocaine, preliminary to an operation for the removal of tonsils. The evidence was that the insured was in good health and had no bodily infirmity or disease, except the condition of his tonsils, which admittedly did not contribute to his death. It was admitted that ordinarily novocaine is absolutely harmless, and the evidence was that it proved fatal to the insured, who was a physician, because, unknown to himself and the operating physician, he had an "idiosyncrasy" or "hypersusceptibility" to the drug. Under those facts Judge Parker said: "Applying these definitions to the facts of the case, it becomes readily apparent that the death of insured was caused by accidental means. To paraphrase the language of Judge Sanborn, it was not the natural and probable consequence of the administration of the novocaine. Death does not ordinarily follow, and cannot reasonably be anticipated, from the use of the drug. Death was produced in the case of insured by means which were neither designed nor calculated to cause it. It was not the result of design, could not have been anticipated, and was produced by an unusual combination of fortuitous circumstances. In the act which preceded the death of insured there was 'something unforeseen, unexpected and unusual,' to use the language of Mr. Justice Blatchford, viz., the application of the novocaine to one who had an 'idiosyncrasy' or 'hypersusceptibility' to the drug. It is true that the doctor intended to apply the drug and insured intended that he should apply it; but neither intended to apply it to a body possessed of the idiosyncrasy. Death resulted because of their applying the drug in ignorance of this peculiarity in the object acted upon, and was a result not calculated nor intended, and one which could not reasonably have been foreseen."

In the instant case it may likewise be observed that "death does not ordinarily follow, and cannot reasonably be anticipated" from an injection of hay fever serum. Here, too, "death was produced in the case of insured by means which were neither designed nor calculated to cause it."

The following federal decisions interpret the term "accidental" in accordance with the principles discussed above: Preferred Accident Ins. Co. v. Patterson (C. C. A. 3) 213 F. 595, 597 (policy limited coverage simply to "accidental" means); Ætna Life Ins. Co. v. Brand (C. C. A. 2) 265 F. 6, 8, 9, 13 A. L. R. 657, certiorari denied 253 U. S. 496, 40 S. Ct. 587, 64 L. Ed. 1031; Zurich General Accident & Liability Ins. Co. v. Flickinger (C. C. A. 4) 33 F.(2d) 853, 854, 855, 68 A. L. R. 161 (policy limited coverage merely to "accidental" means); Norris v. New York Life Ins. Co. (C. C. A. 4) 49 F.(2d) 62, 63, 64; New York Life Ins. Co. v. Gustafson (C. C. A. 3) 55 F.(2d) 236, 237. See, also, Cooley's Briefs on Insurance (2d Ed.) vol. 6, p. 5234.

While we are not undertaking to declare wherein lies the weight of authority on this question so far as the state courts are concerned, we desire to refer to two or three well-considered and well-reasoned decisions by highest state tribunals.

In the Lewis Case, supra, Mr. Justice Cardozo used the following language: "We think there is testimony from which a jury might find that the pimple had been punctured by some instrument, and that the result of the puncture was an infection of the tissues. If that is what happened, there was an accident. We have held that infection resulting from the use of a hypodermic needle is caused by 'accidental means.' Bailey v. Interstate Casualty Co., 8 App. Div. 127, 40 N. Y. S. 513; Id., 158 N. Y. 723, 53 N. E. 1123; Marchi v. Ætna Life Ins. Co., 140 App. Div. 901, 125 N. Y. S. 1130; Id., 205 N. Y. 606, 98 N. E. 1108. The same thing must be true of infection caused by the puncture of a pimple. Unexpected consequences have resulted from an act which seemed trivial and innocent in the doing. Of itself, the scratch or the puncture was harmless. Unexpectedly it drove destructive germs beneath the skin, and thereby became lethal. To the scientist who traces the origin of disease there may seem to be no accident

in all this. 'Probably it is true to say that in the strictest sense, and dealing with the region of physical nature, there is no such thing as an accident.' Halsbury, L. C., in Brintons v. Turvey, L. R. 1905 A. C. 230, 233. But our point of view in fixing the meaning of this contract must not be that of the scientist. It must be that of the average man. Brintons v. Turvey, supra; Ismay v. Williamson, L. R. 1908 A. C. 437, 440. Such a man would say that the dire result, so tragically out of proportion to its trivial cause, was something unforeseen, unexpected, extraordinary, an unlooked-for mishap, and so an accident. The test—the one that is applied in the common speech of men—is also the test to be applied by courts. [Many cases cited]."

So, here, "unexpected consequences have resulted from an act which seemed trivial and innocent in the doing," and "of itself, the scratch or the puncture, was harmless." While it is true that in the Lewis Case the court was considering a policy which involved merely accidental means, which need not be violent or external, the observations of the distinguished jurist are illuminating here.

█ In its opinion, the court below seemed disturbed by the fact that the appellant failed to show "just how" the fatal infection occurred. (D. C.) 1 F. Supp. 951, 953. A cogent answer to this objection is to be found in International Travelers' Ass'n v. Francis, 119 Tex. 1, 23 S.W.(2d) 282, 283, decided by the Supreme Court of Texas. Mr. Chief Justice Cureton used the following language: "The cause of death was an infection which produced Ludwig's Angina, a result so extraordinary and rare, and so unrelated to the surgical act performed, that it must be regarded as accidental. The drawing of the tooth and treatment following were of course purposeful and not accidental, but the infection was not the necessary or usual result of this purposeful act. It was extraordinary, unusual and very rare. The proper surgical act therefore must have been accompanied by something unexpected, unforeseen, and improbable. This unforeseen, unexpected, and improbable thing was the injection of the pathogenic organisms into the tissues. Just how they were injected the evidence does not show with mathematical precision; and in the nature of things this can never be done in any case. These organisms do not make their presence known by ordinary methods of detection."

In the above case the court was considering terms in a policy again virtually identical with those in the policies with which we are here concerned. The same was true in the case of Strommen v. Prudential Ins. Co. (Minn.) 245 N. W. 632, 633, 634, decided on December 2, 1932. There the death of the insured had been caused by voluntary pressure upon a pimple for the purpose of expressing the pus, with the result that the pus got into the decedent's system. The Supreme Court of Minnesota, in affirming an order denying the defendant's motion for judgment notwithstanding the verdict, or for a new trial, observed: "The result was accidental in its unforeseen and unintended consequences."

Basing our opinion both upon reason and authority, we hold that the court below erred in refusing the appellant's request for a conclusion of law to the effect that "plaintiff is entitled to judgment according to the prayer of her complaint."

█ The appellant suggests that, "where a jury is waived, a proper judgment may be entered by the Circuit Court of Appeals, without remanding the cause for further consideration by the District Court." While there is some authority for this view, we believe that the better practice is for the appellate court to remand the case to the lower court, with instructions, if the circumstances justify it, to the lower court to render a specific judgment.

Section 10 of the Act of March 3, 1891, c. 517, 26 Stat. 829 (28 USCA § 877), provides as follows:

That "whenever on appeal or writ of error or otherwise a case coming directly from the district court [or existing circuit court] shall be reviewed and determined in the Supreme Court the cause shall be remanded to the proper district [or circuit] court for further proceedings to be taken in pursuance of such determination. And whenever on appeal or writ of error or otherwise a case coming from a circuit court of appeals shall be reviewed and determined in the Supreme Court the cause shall be remanded by the Supreme Court to the proper district [or circuit] court for further proceedings in pursuance of such determination. Whenever on appeal or writ of error or otherwise a case coming from a district [or circuit] court shall be reviewed and determined in the circuit court of appeals in a case in which the decision in the circuit court of appeals is final such cause shall be remanded to the said district court [or circuit court] for further proceedings to be there taken in pursuance of such determination."

By section 11 of the same act (28 US

464

CA § 228 note), the entire foregoing section is made applicable to Circuit Courts of Appeal. Section 11 provides in part: "And all provisions of law now in force regulating the methods and system of review, through appeals or writs of error, shall regulate the methods and system of appeals and writs of error provided for in this act in respect of the circuit courts of appeals, including all provisions for bonds or other securities to be required and taken on such appeals and writs of error. * * *"

See, also, Realty Acceptance Corp. v. Montgomery, 284 U. S. 547, 550, 52 S. Ct. 215, 76 L. Ed. 476.

In Cleveland Rolling Mill Co. v. Rhodes, 121 U. S. 255, 264, 7 S. Ct. 882, 886, 30 L. Ed. 920, the court said: "It conclusively appearing, upon the facts found by the court below, that the original plaintiffs cannot maintain their action, it is ordered, in accordance with the precedents of Fort Scott v. Hickman, 112 U. S. 150, 5 S. Ct. 56 [28 L. Ed. 636], and Allen v. St. Louis Bank, 120 U. S. 20, 7 S. Ct. 460 [30 L. Ed. 573], that the judgment be reversed, and the case remanded to the circuit court, with directions to enter judgment for the original defendant."

See, also, Redfield v. Parks, 132 U. S. 239, 252, 10 S. Ct. 83, 33 L. Ed. 327; Stanley v. Schwalby, 162 U. S. 255, 282, 283, 16 S. Ct. 754, 40 L. Ed. 960; International Harvester Co. v. National Surety Co. (C. C. A. 7) 44 F.(2d) 746, 750, certiorari denied 282 U. S. 895, 51 S. Ct. 179, 75 L. Ed. 788.

Accordingly, in each of the two consolidated cases the judgment is reversed and the cause remanded to the District Court, with instructions to enter a judgment for the appellant in the sum of $5,000, with interest from August 1, 1930.

Reversed and remanded, with instructions.