## WELLS FARGO BANK & UNION TRUST CO. v. MUTUAL LIFE INS. CO. OF NEW YORK.
### No. 7101.

Circuit Court of Appeals, Ninth Circuit.

Sept. 6, 1933.

Arnold C. Lackenbach, F. Whitney Tenney, Richard E. Guggenheim, and Heller, Ehrman, White & McAuliffe, all of San Francisco, Cal., for appellant.

F. Eldred Boland, Knight, Boland & Riordan, and Leo R. Friedman, all of San Francisco, Cal., for appellee.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

GARRECHT, Circuit Judge.

This is an appeal from a judgment entered upon a verdict directed by the trial court at the close of plaintiff's case in favor of appellant, plaintiff below, in the sum of $14,527.65.

This action was originally brought by appellant as trustee under a so-called insurance trust agreement executed by Walter Radius as settler, and in which appellant was named beneficiary of a life insurance policy issued by respondent company on the life of Walter Radius in the face amount of $15,000. The policy provides for double indemnity in the event of death resulting from "bodily injury

effected solely through external, violent and accidental means."

Walter A. Radius, the insured named in the policy, came to his death as a result of asphyxiation due to carbon monoxide gas coming from and generated by his automobile upon which he was or had been working in and about the garage at his residence.

In 1919 or 1920 Radius took a course in automobile repairing given by the University of California Extension Division and received a certificate therefor. He frequently worked on his automobile, apparently making it a sort of hobby. He owned a Rickenbacher eight-cylinder sedan about six years old, upon which, for a long time, he had been in the habit of making minor repairs and adjustments. About a week before his death he and several others had returned from a trip to Death Valley made in the car described. Several times after the return from this trip he remarked that he wanted to clean up the car, tighten it up, and put it in order, saying that the pump needed packing, an oil line leaked, and the battery box rattled. After dinner on the evening of April 6, 1932, he and his wife listened to the radio until about 8 o'clock, when Mr. Radius said that he had the time and inclination to work on the car, and, after playing with his dog for awhile, went down to the garage. The deceased was a man 52 years of age and in perfect health at the time of his death. His family life had been harmonious, and apparently he had no serious financial difficulties nor had he been showing any moodiness or signs of despondency.

The dimensions of the garage referred to are approximately as follows: Twenty-two feet long, thirteen feet two inches wide, and nine feet four inches high, with additional air space in the rear eight feet wide, eight feet high, seventeen feet two inches long. The house consists of two floors and the basement, with the garage below, which is reached by going down an outside staircase, then back through the basement and down another stairway to the garage. The door at the head of the stairway leading from the basement down to the garage was open, which would allow a volume of air to come into the garage. There was a small crack under the front garage door and a few cracks in the side wall that would admit air.

After Mr. Radius went to the garage, his wife did some work on the lower floor and then went upstairs to bed, where she read for about two hours. During that time she heard the dog barking in the basement as if some one was playing with it and also heard some hammering. About 10 o'clock she turned out the light and fell asleep. She awakened suddenly about 1:30 a. m. and saw that Mr. Radius had not come into the room; looked into the closet, she saw that his nightclothes were still there, and then remembered that he was working in the garage; she rushed to that part of the house. On the way down she noticed that the door leading from the basement down to the garage was open. The light was burning in the garage, the room was hot, and there was a strange odor. Mr. Radius was lying on a dolly at the foot of the stairs with his legs, from the knees down, under the car and his head and torso out from under the car, grease and oil spots were on his face and hands, and a monkey wrench was in his hand. After opening the garage, she dragged him out on the sidewalk, then turned off the engine of the car, which was running. The hood of the automobile on the side nearest the stairs was open. An extension light was hanging in the open hood. She further testified that she had heard hammering or chopping probably twice while she was reading in bed, and that her husband had worked in the garage on other occasions when she had retired. She also stated that on the night in question she had heard Mr. Radius come upstairs from the garage to the basement two or three times; the last time being about the time she fell asleep. On the day after Mr. Radius' death she found a hatchet and some chips of wood on the table in the laundry that were not there the day before his death.

Walter Radius, 22 year old son of the deceased, testified that the trip to Death Valley and return covered about 1,500 miles, and that the car developed several rattles and squeaks and several adjustments were needed such as tightening up the pump and the brake rod, that his father had been in the habit of making repairs to the automobile, and that he assisted him frequently when at home from Stanford University where he was a student. He examined the battery of the car shortly after his father's death and found that some pieces of wood had been recently wedged in the lower part of the battery box to keep the battery from shifting around as it had done in the past. The wood used was clean. When the car was running, the choke was usually pushed in the whole way, but sometimes the vibration would force it out about one-eighth of an inch. On the morning of Mr. Radius' death, when he went to start the car for the representative of the Health Department, he noticed that the choke was out slightly—prob-

ably from three-sixteenths to one-fourth of an inch.

Another witness, a garage man who had done some work on the Rickenbacher, testified that the deceased was in the habit of working on his own automobile, and that during a conversation with him before his death the witness instructed the deceased how to keep the pump on the car tight, and that it was necessary for the car to be running in order to tighten the pump.

The evidence further showed that several years before the deceased's death there had been a discussion between him and his wife regarding carbon monoxide poisoning from the exhaust of an automobile, occasioned by the fact that the father of a friend of one of the children had met death in that way, but there had been no further reference or discussion about it since that time.

At the close of plaintiff's case, the defendant moved the court for a directed verdict of the jury in favor of plaintiff for the sum of $14,527.55, which amount had been tendered, being the principal amount of the policy less accrued premium due, which motion the court granted.

The motion was made upon the grounds that the plaintiff had not introduced evidence sufficient to warrant or support a verdict in its favor for double indemnity or to prove that the death of Walter A. Radius was effected by or through accidental means, and furthermore the evidence affirmatively established that his death was not effected by accidental means, but was the natural and probable consequence of his voluntary act in starting and running the engine of his automobile in the garage where carbon monoxide was discharged, from the result of which he died.

From the ruling of the court directing the jury to return a verdict in favor of plaintiff at the close of plaintiff's case and the judgment entered thereon, plaintiff has appealed.

The questions for determination are whether accidental death by asphyxiation under the circumstances of this case satisfies the requirements of the policy that death must result from "bodily injury effected solely through external, violent and accidental means," and was the undisputed evidence sufficient to carry the case to the jury.

The issues in the case have been simplified. For the purpose of this appeal it may be assumed that appellant does not deny that the insured voluntarily and intentionally caused the motor to be started; however, neither appellee in its motion for a directed verdict nor

the trial judge in granting the motion acted upon any assumption that the evidence indicated that deceased had committed suicide. It is conceded that, under the circumstances as pleaded and proved, the death of the insured was caused by external and violent means.

The sole question remaining is: Were the means which the evidence shows might have caused death necessarily excluded from being classed as "accidental means"?

The distinction between "accidental death" and "death by accidental means" has often been discussed in the reports [1] and requires no extended comment here. To sustain the ruling of the lower court, much emphasis has been placed upon Olinsky v. Railway Mail Association, 182 Cal. 669, 189 P. 835, 836, 14 A. L. R. 784, Rock v. Travelers' Insurance Company, 172 Cal. 462, 156 P. 1029, L. R. A. 1916E, 1196, Pledger v. Business Men's Association (Tex. Civ. App.) 197 S. W. 889, but in these cases death resulted from overexertion, and, as stated in the opinion in the case Olinsky v. Railway Mail Association, supra, "overexertion is not an accidental means of death." In support of this statement the opinion cites a long list of authorities.

In considering the case at bar, it is important to notice this distinction which had been clearly indicated in the law.

"It is now well established that where death is caused by asphyxiation and the breathing of the gas was not intentional, the means or cause of death is accidental." Urian v. Equitable Life Assur. Soc., 310 Pa. 342, 165 A. 388, 391; Metropolitan Life Ins. Co. v. Broyer (C. C. A. 9) 20 F.(2d) 818, 820; Cornelious on Accidental Means, p. 65.

In the Broyer Case, supra, from this circuit, the opinion of the court in approving the doctrine stated makes use of this language: " * * * We agree with the construction put upon policies like that under consideration holding that death occasioned by asphyxiation, as would be death by drowning, when such casualty is not intended by the deceased, is due to injuries effected through external, violent and accidental means."

In United States Mutual Accident Association v. Barry, 131 U. S. 100, 109, 9 S. Ct. 755, 759, 33 L. Ed. 60, involving a like question, where a young physician, thirty years of age, in jumping or stepping downward from a platform four feet high unexpectedly and

---

[1] United States Mutual Accident Ass'n v. Barry, 131 U. S. 100, 121, 9 S. Ct. 755, 33 L. Ed. 60; McCarthy v. Travelers' Ins. Co. (C. C. Wis.) Fed. Cas. No. 8682; Pledger v. Business Men's Ass'n (Tex. Civ. App.) 197 S. W. 889.

wholly without fault or negligence received an injury which caused death, the Supreme Court quotes from the charge of the trial court to the jury and says: "We understand, from the testimony, without question, that the deceased jumped from the platform with his eyes open, for his own convenience, in the free exercise of his choice, and not from any perilous necessity. He encountered no obstacle in jumping, and he alighted on the ground in an erect posture. So far we proceed without difficulty; but you must go further and inquire, and here is the precise point on which the question turns: Was there or not any unexpected or unforeseen or involuntary movement of the body, from the time Dr. Barry left the platform until he reached the ground, or in the act of alighting? Did he or not alight on the ground just as he intended to do? Did he accomplish just what he intended to, in the way he intended to? Did he or not unexpectedly lose or relax his self-control, in his downward movement? Did his feet strike the ground as he intended or expected, or did they not? Did he or not miscalculate the distance, and was there or not any involuntary turning of the body in the downward movement, or in the act of alighting on the ground? These are points directly pertinent to the question in hand."

The Supreme Court then adds: "It is further urged that there was no evidence to support the verdict, because no accident was shown. We do not concur in this view. The two companions of the deceased jumped from the same platform, at the same time and place, and alighted safely. It must be presumed, not only that the deceased intended to alight safely, but thought that he would. The jury were, on all the evidence, at liberty to say that it was an accident that he did not. The court properly instructed them that the jumping off the platform was the means by which the injury, if any was sustained, was caused; that the question was whether there was anything accidental, unforeseen, involuntary, unexpected, in the act of jumping, from the time the deceased left the platform until he alighted on the ground; * * * that if, in the act which precedes the injury, something unforeseen, unexpected, unusual, occurs which produces the injury, then the injury has resulted through accidental means."

See, also, the opinions of this court in Metropolitan Life Insurance Co. v. Broyer, supra, and Jensma v. Sun Life Assurance Co., 64 F.(2d) 457, 460.

■ In the face of these authorities, it is not correct to say that "accidental means" can never exist where those "means" were voluntarily put in operation by the deceased, but that we must also look to the "intention" of the deceased and whether or not there was negligence on his part, and whether the result was unintended; whether he "miscalculated" the length of time the motor was running; whether he unexpectedly lost his self-control; or whether there was anything accidental, unforeseen, involuntary, or unexpected, as the opening of the choke, that happened between the time the motor was started and death resulted. It follows, that this "element of unexpectedness in the act or occurrence which leads to the injury or death," commented upon by the trial court and held to be lacking, may have been found by the jury to have taken place immediately prior to the actual injury or event which directly caused the death.

In Metropolitan Life Ins. Co. v. Broyer, supra, the death of decedent was by asphyxiation caused by his turning on an open gas jet, and, in affirming a judgment of death by "accidental means," we said: "The jury may have inferred that Broyer, while at the telephone, nervously reached up, and without meaning to do so, turned on the gas cock; or, that in pulling the telephone directory, which hung on the gas jet, he may have turned on the cock; or that in going to the basin he may have staggered and laid hold of the jet, and unintentionally turned on the cock; or that his senses may have been so muddled that he turned on the cock, believing it was the switch for the electric lights. Any one of the circumstances enumerated is *inferable*, and warrants the conclusion that the gas cock was opened by Broyer with no intention of turning on the gas. United States Fidelity & Guaranty Co. v. Blum (C. C. A.) 270 F. 946; Mutual Life Ins. Co. v. Hatten (C. C. A.) 17 F.(2d) 889; Beach on Insurance, § 250." (Italics supplied.)

Again in the recent case of Jensma v. Sun Life Assurance Company, supra, after discussing the early case of McCarthy v. Travelers' Ins. Co. (C. C. Wis.) Fed. Cas. No. 8682, involving the construction of a similar policy clause, we said: "The decedent voluntarily submitted to the injection. But the introduction of the death-dealing organisms into his system was an 'unforeseen or unexpected circumstance which interfered with or obstructed the usual course of' the treatment to which he had thus voluntarily submitted."

■ It is difficult to differentiate the case at bar from the foregoing authorities, in each of which the jury, or the court sitting without a

jury, found that some unforeseen or unexpected circumstance or element interrupted or changed the natural course of events *set in motion by the decedent*. In the Barry Case it was found that death was by "accidental means" occasioned by the voluntary jumping or stepping from a platform four feet to the ground below; in the Broyer Case that decedent did not intentionally commit the act which caused death; and it would seem to follow the instant case, under the premise that death was "accidental," that the "breathing of the gas was not intentional."

The only remaining question to discuss is: What was the intention or purpose of decedent in starting the motor in the garage, and was decedent negligent in so starting the motor in view of the fact that a door leading to a room adjoining the garage, and a door leading to the home proper, were both open?

Aside from the fact that decedent had heard of death from carbon monoxide poisoning, the record is silent as to his knowledge of this gas, or as to his knowledge of what constitutes a properly ventilated garage under the circumstances in question, or whether or not some unforeseen element, as for instance fainting or mere forgetfulness, intervened to prevent his shutting off of the motor after his purpose of starting same had been accomplished.

The jury, if the case had gone to them for a decision on the facts, may well have inferred from the evidence that decedent had made a habit of starting the motor of the car in connection with his work on the car; that what he had done on the night in question was his usual practice; that the motor was started for the purpose of transmitting vibration to the car to test for rattle; that there was no negligence, because decedent had been careful to vent the garage by leaving the door leading to the home proper and the door to a room adjoining the garage open; that the evidence compels the inference that the insured did not intend to encompass his own death. In view of the testimony of the industrial inspector of the department of public health and the professor of pharmacology at the University of California, the conclusion is warranted that with the existing ventilation death would not naturally and reasonably be expected from the starting of the motor alone. A jury might well be correct in concluding that, had the deceased not engaged in the physical action incident to chopping and making the wooden wedges, which because of increased respiration resulted in his inhaling larger quantities of the carbon monoxide fumes than he otherwise would, the mere operation of the motor would not have occasioned his death. That the insured believed that there was sufficient ventilation to carry off any poisonous fumes that might be emitted from the exhaust is definitely inferable from the facts as they appear.

Then, too, as bearing upon the issue, it was for the jury to consider the undisputed evidence that usually when the car was running the choke was pushed in the whole way, and that sometimes the vibration would force it out. The evidence shows that after the discovery of the death of Mr. Radius upon examination of the car it was noticed the choke was out. This circumstance along with the testimony of the experts might well lead to the conclusion that this was the "accidental means" which unexpectedly increased the amount of carbon monoxide emitted from the engine, which caused the death of the insured.

"Accidental means" has been variously defined. The Circuit Court of Appeals for the Eighth Circuit, in Western Commercial Travelers' Ass'n v. Smith, 85 F. 401, 405, 40 L. R. A. 653, had under consideration the identical insurance clause here involved, and said: "The significance of this word 'accidental' is best perceived by a consideration of the relation of causes to their effects. * * * An effect which is not the natural or probable consequence of the means which produced it, an effect which does not ordinarily follow and cannot be reasonably anticipated from the use of those means, an effect which the actor did not intend to produce and which he cannot be charged with the design of producing under the maxim to which we have adverted [that every man must be held to intend that natural and probable consequence of his deeds], is produced by accidental means. It is produced by means which were neither designed nor calculated to cause it. Such an effect is not the result of design, cannot be reasonably anticipated, is unexpected, and is produced by an unusual combination of fortuitous circumstances; in other words, it is produced by accidental means."

In Wiger v. Mutual Life Insurance Co. of New York, 205 Wis. 95, 236 N. W. 534, 538, the evidence showed that the insured knew of the dangers of monoxide gas generated by automobiles. He died from the effects of such gas while working upon his car in a garage at the rear of his home. It was contended that since the means of death was set in motion by the voluntary act of the deceased, and since the consequences were the result of this act

without any intervention or slip in doing the act, the means of death were not accidental.

The court there said: "It is our conclusion that the term 'accidental means' must be interpreted according to the usage of the average man. So interpreted, we have no doubt that the means of death in this case must be designated as accidental. To eliminate from the definition of 'accidental means' all cases where the injury happened as the natural or forseeable result of a force or event voluntarily set in motion by the insured may have some scientific justification, but is contrary to the common understanding of the term and tends unfairly to limit such policies to cases where the insured is guilty of no negligence."

Although the insured may have voluntarily placed himself in a position of danger, even recklessly though it may have been and by miscalculation or through some force not anticipated or foreseen, as a hidden defect causing a larger quantity of carbon monoxide to be emitted from the engine, the injury would have been through accidental means within the meaning of the policy.

In United States Fidelity & Guaranty Co. v. Blum (C. C. A.) 270 F. 946, 954, the same question here involved was presented. A man fell from a window of a building and died as a result. In passing on this case, the court reviewed the decisions at length, and, applying the case of United States Mutual Accident Ins. Ass'n v. Barry, supra, said: "Now, extending the doctrine of this latter case to what might have happened with Blum, if he deliberately placed himself in a position where he would fall, realizing that such would be the result of his act, then it could not be said that his injury came about through external, violent, and accidental means within the terms of the policy; this because the act would be voluntary and deliberate, and the result could not have been unforeseen. But if he voluntarily placed himself in a position of danger, even recklessly though it may have been, and through accident, by misstep or miscalculation, or through the force of gravity not anticipated or foreseen, and was precipitated from the window ledge, the cause of the injury would have been through accidental means within the meaning of the policy."

True, the jury cannot be permitted to find its verdict upon conjecture and surmise; but from a careful review of the entire testimony in the record we find it was quite sufficient whereon to submit the case to the jury. The trial court erred in directing a verdict for appellant, the judgment is reversed, and the case is remanded for a new trial.